ALBERT A. SPRAGUE et al.

v.

THE NATIONAL BANK OF AMERICA et al.

*Opinion filed February 14, 1898—Rehearing denied April 19, 1898.*

1. CORPORATIONS—*agreement by which corporation issues its stock for property must constitute a valid contract.*  While a corporation organized under the laws of Illinois may issue shares of stock in payment for property of a character which it may lawfully acquire, and may agree with the subscribers as to the value of such property, yet such agreement, to be binding, must constitute a valid contract of bargain and sale, and must be made in good faith and in the exercise of judgment fairly and honestly directed.

2. SAME—*how far stock issued in payment for property will be deemed paid.*  Shares of stock issued by an Illinois corporation in payment for the property and assets of a foreign corporation, under an agreement that the property and assets should be received at an agreed price in excess of its value but equaling the amount of the capital stock of each corporation, which was the same, the Illinois corporation assuming the other's obligations, will be deemed paid, as against creditors, only to the extent of the net value of such property and assets in excess of the assumed indebtedness.

3. SAME—*statutory liability of stockholder—effect of assignment of stock.*  Under section 8 of the Corporation act (Rev. Stat. 1874, p. 287,) each stockholder is liable for the debts of the corporation to the extent of the amount unpaid upon his stock, and his assignment thereof does not release him from such liability.

4. SAME—*purchaser without notice that stock is not fully paid is not liable for unpaid balance.*  A purchaser or assignee of stock which has not been fully paid is not liable to corporate creditors for the unpaid balance, where the stock was issued as fully paid and he acquires the same in good faith, without notice.

5. SAME—*purchaser of stock with notice jointly liable with seller.*  A purchaser or assignee of stock who takes the same with notice that it is not paid up stock, though purporting to be such, is jointly liable with the seller or assignor for the balance unpaid.

6. SAME—*creditor's knowledge that stock was not fully paid does not affect his rights.*  The right of a corporate creditor to enforce liability against stockholders who have not paid their subscriptions in full is not dependent, in any degree, upon his knowledge, at the time of extending credit, that such subscriptions were or were not paid in full.

*Nat. Bank of America* v. *Pacific Ry. Co.* 66 Ill. App. 320, affirmed.

| 172 | 149 |
| 172 | 270 |

| 172 | 149 |
| s93a | 24 |
| f93a | 3 41 |
| s93a | 298 |

| 172 | 149 |
| s191 | 359 |
| f192 | 3383 |

| 172 | 149 |
| f193 | 2397 |
| 193 | 4400 |
| 99a | 1589 |

| 172 | 149 |
| 194 | 1600 |
| s195 | 113 |

| 172 | 149 |
| 199 | 4 30 |

| 172 | 149 |
| 205 | 1 48 |

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

GREEN, ROBBINS & HONORE, EDWIN BURRITT SMITH, WILSON, MOORE & MCILVAINE, JAMES L. HIGH, HERRICK, ALLEN, BOYESEN & MARTIN, and JOHN P. WILSON, (A. W. GREEN, of counsel,) for appellants.

WALKER & EDDY, MORAN, KRAUS & MAYER, and WINSTON & MEAGHER, (EDWIN WALKER, T. A. MORAN, and JAMES F. MEAGHER, of counsel,) for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was a bill in chancery filed by Charles F. Morse, one of the appellees, against the appellants, alleging the insolvency of the Pacific Railway Company, a corporation organized under the general incorporation laws of this State; that said corporation was indebted to him; that the appellants were shareholders of its capital stock and had not paid in full their subscriptions to the capital stock; and the prayer was the appellants should be made defendants to the bill, and each required to pay his *pro rata* share of the amount due the complainant, to the extent of the unpaid portion of stock held by each of said defendants. The other appellees are creditors of the said Pacific Railway Company who filed intervening petitions, and thereby came into the case as co-complainants with the said original complainant. The answers of the appellants, in substance, were that the subscriptions to the capital stock of the company had been paid in full. The cause was referred to a master, the proofs taken and reported, and a decree entered that the bill be dismissed for want of equity. The case came by appeal to the Appellate Court for the First District, and the decree of the circuit court was reversed and the cause remanded, with

directions as to the further course to be pursued by the trial court.   This is an appeal prosecuted by the defendants to the said bill in chancery to bring the judgment of the Appellate Court into review in this court.

The Pacific Railway Company was incorporated under the general incorporation laws of the State of Illinois on the 22d day of August, 1889, with a capital stock of $2,500,000, divided into 25,000 shares, of $100 each.   The entire capital stock was subscribed by five of the appellants, to-wit, John J. Mitchell, C. B. Holmes, Alexander Geddes, James L. Houghteling and Morton B. Hull, each of whom subscribed for 5000 shares.   No money was paid by any of such subscribers, but the contention of appellants is such subscriptions were paid in full by the transfer of the assets and shares of capital stock of the Los Angeles Cable Railway Company, a corporation organized under the laws of the State of California, to the said Pacific Railway Company, the latter company, as a part of the transaction, assuming to pay the indebtedness of the cable company.

It appeared from the proofs the said cable company was incorporated under the laws of the State of California on the 13th day of July, 1887, with authority to construct a cable railway in the city of Los Angeles, California; that its capital stock was fixed at $2,500,000, divided into 25,000 shares, of $100 each; that only 650 shares of its capital stock were ever subscribed for to be paid in cash; that the subscribers thereto were as follows:   J. F. Crank 630 shares, and Charles Freeman, S. P. Jewett, S. C. Hubble and O. J. Hellman each five shares, who together paid only the sum of $6500 on their subscriptions; that on the 30th day of July, 1887, the said cable company leased three lines of horse railways in the city of Los Angeles, at an annual rental of $10,000 for each line, and by the further terms of the lease assumed to pay the indebtedness of the three lines of horse railways, aggregating the sum of $90,000; that on the 7th

day of May, 1888, said cable railway company contracted to acquire the capital stock of the said horse railways, paying five shares of its capital stock for each share of stock of the said horse railway companies; that on the 15th day of September, 1887, the said cable company executed a mortgage on all its property, including the lines of horse railways, to secure its bonds, in the sum of $1,500,000, which it designed to place upon the market for sale, and such bonds, amounting in the aggregate to $836,000, were sold; that in addition to this bonded debt the company had contracted other obligations, aggregating in all more than $2,000,000; that an assessment on the stockholders sufficient to raise the sum of $100,000 was levied by the board of directors, to be paid November 1, 1888; that while the affairs of the cable company were thus situated, a committee representing a number, if not all, of the appellants visited the city of Los Angeles and bought a large block of the stock of the cable company, paying $32 per share for each share of the face value of $100; that the number of shares so purchased does not clearly appear, nor does the record disclose the names of the purchasers, other than appellants Holmes and Mitchell, but it seems well established the purchase was consummated by a committee acting for themselves and others, and that the number of shares secured constituted a controlling interest in the company, and, counsel for appellants say, constituted about three-fourths of the capital stock; that appellants Holmes and Mitchell were elected directors of the cable company January 1, 1889, and appellant Holmes was elected its president February 1, 1889; that the board of directors authorized appellant Holmes, its president, to borrow money for the company for the purpose of paying its floating indebtedness and to defray the expense of extending the lines of the company; that the said Holmes borrowed large sums of money very soon thereafter, the aggregate of such loans reaching the sum of $400,000 by the first of March,

1889; that of this amount $350,000 was applied to the construction of new lines or extending the old lines of the cable company, and the remainder was used in the payment of dividends to the stockholders; that the stock purchased by the Chicago parties, who are appellants here, was held by J. F. Crank, former president of the cable company, to whom it had been issued in exchange for the stock of certain horse railway companies, under an arrangement with Crank and other owners of the horse railway companies, by which the cable company gave five shares of its stock for each share of horse railway stock, and therefore the amount paid in the purchase of the stock by the said appellants did not reach the treasury of the cable company; that under the laws of the State of California each holder of the cable company stock was made liable for his *pro rata* portion of the indebtedness of the company; that while the entire capital stock of the cable company, to-wit, $2,500,000, has been issued as fully paid up, the company has only received from its shareholders in cash $6500, paid in upon the organization of the company, and $100,000 assessed and paid November 1, 1888, being the first and only assessment, and had repaid to them $50,000 out of the sums borrowed by Holmes, the remainder of the stock having been disposed of by the transaction between the cable company and its president and others, who were the owners of the stock of the horse railway companies, wherein five shares of the stock of the cable company were valued as equal to and were exchanged for one share of the stock of the horse railway companies, the cable company, in addition, assuming to pay the indebtedness of the horse railway companies to an amount approximating the sum of $90,000; that at the opening of the month of August, 1889, the indebtedness of the cable company, floating and bonded, had reached, and probably exceeded, the sum of $2,000,000, of which amount $1,264,000 was not bonded but partly due and all soon to mature, and

in view of the fact that under the laws of the State of
California each stockholder was personally liable for his
*pro rata* share of the indebtedness of the corporation, a
number of those owning and holding shares of its stock,
probably thirty to forty in number, including appellant
Holmes, its president, and J. F. Crank, its vice-president,
came together in the city of Chicago on the 5th day of
August, 1889, to confer as to the situation; that the re-
sult of their deliberations was that they concluded they
could relieve themselves of the liability created by the
laws of the State of California by organizing a corpora-
tion under the laws of the State of Illinois, having a like
capital stock and a like number of shares of stock as the
cable company, and transferring the assets and property,
rights and franchises of the cable company to the pro-
posed Illinois corporation, and issuing a like number of
shares of stock in the Illinois corporation, to be deemed
as paid in full, and exchanging the same with the hold-
ers of the cable company stock share for share, and it
was decided an Illinois corporation should be organized
and that course pursued; that in pursuance of such con-
clusion, and for the purpose of carrying it into effect,
certain of the appellants who had participated in the
meeting of said holders of shares in the cable company,
and acting in behalf of the other of said participants, on
the 9th day of August, 1889, filed with the Secretary of
State of the State of Illinois the statement required by
section 2 of chapter 32 of the Revised Statutes of Illi-
nois, entitled "Corporations," as the initiatory step in the
formation of a corporation in this State, and received
license empowering them, as commissioners, to receive
subscriptions to the capital stock of a corporation to be
called the Pacific Railway Company, to the amount of
$2,500,000, and on the .... day of August, 1889, they re-
ported that they had obtained subscriptions for the en-
tire amount of the capital stock, and that a meeting of
the subscribers had been held, and John J. Mitchell,

Morton B. Hull, Alexander Geddes, James L. Houghteling and Charles B. Holmes had been elected directors.

It will be observed that all of said persons so selected as directors are appellants, and were stockholders in the cable company, and that Mitchell and Holmes were directors of said cable company and that Holmes was its president. It also appears from the testimony that the only subscribers to the capital stock of the said Pacific company were the said five persons reported as having been selected as directors, each of whom subscribed for 5000 shares of the capital stock but paid nothing for said stock, and were not to pay anything, but were to simply hold the shares until they should be exchanged for like numbers of shares in the stock of the cable company. .

Said subscriptions to the capital stock of the Pacific company having been entered, the said Holmes, as president of the cable company, and the said Holmes, Mitchell, Houghteling, Hull and Geddes, assuming to act as directors of the Pacific Railway Company, without waiting for the issuance of articles of incorporation, prepared and sent to each stockholder of the cable company the following circular letter:

"IMPORTANT TO SHAREHOLDERS OF THE LOS ANGELES CABLE RAILWAY COMPANY.

CHICAGO, Ill., *August 15, 1889.*

"DEAR SIR—Every shareholder in any corporation organized under the laws of California is responsible for a *pro rata* proportion of all indebtedness incurred by the corporation during the time that he is a stockholder of record therein; nor is the obligation relieved by the sale and transfer of the stock, but he remains, during the life of the corporation, personally liable for such a proportion of the indebtedness incurred while he was a shareholder as the amount of his stock bears to the entire capital stock of the corporation. California is the only State in the Union which has such a peculiar law.

"At a meeting of gentlemen who are stockholders in the Los Angeles Cable Railway Company, and representing a large majority in the stock of that company, held at the Grand Pacific Hotel in this city on the 5th inst., the matter was thoroughly discussed, and it was unanimously resolved that a corporation be organized under the laws of, the State of Illinois, with $2,500,000 of capital stock, being the same amount of the capital stock of the Los Angeles Cable Railway Company, and that all holders of shares in the latter company be requested to exchange their shares for an equal number in the Illinois corporation. The capital stock of the latter company will be full paid, inasmuch as it holds as its assets the capital stock of the Los Angeles Cable Railway Company, turned into it at the agreed price of $2,500,000. In this way the Illinois company, as a corporation, becomes responsible under the laws of California, and not the individual holders of the Los Angeles stock, and the individual shareholders will in this way be relieved of personal liability, which, though it may be regarded by some as remote, does nevertheless exist, and in case many years from now, after the present stockholders have disposed of their holdings, the road shall fall into incompetent hands, or into the ownership of those who might not properly guard its indebtedness, the tangible property of the company might be sold for a much less amount than would cover its bonded indebtedness, and in that case the present shareholders would be personally responsible for their *pro rata* amount of such deficiency. It is proposed to pay off, out of the proceeds from the sale of bonds of the new company, hereinafter described, all indebtedness for construction and equipment, leaving absolutely no liability, actual or prospective, resting upon the stockholders who exchange their stock as suggested above.

"Another difficulty has also been encountered, namely: When the trust deed was issued by the former owners of the road it was believed that $1,500,000,—the limit of said

trust deed,—would be sufficient to construct the twenty miles of cable road which is now almost finished; but the actual cost of such construction will be about $2,000,000, and in a city which has grown from 10,000 people eight years ago to some 88,000 people at the present time, it is almost certain that additional cars, and probably extensions of lines, will be required in the near future, and no provisions whatever were made for this under the trust deed heretofore issued. Consequently, at the meeting held on the 5th inst., it was the unanimous opinion of the gentlemen present that when the new corporation should be organized, an issue of $2,500,000 of bonds should be provided for, secured by suitable trust deed, $836,000 of these bonds not to be issued by the trustee, except for the purpose of taking up and canceling an equal amount of the bonds of the Los Angeles Cable Railway Company, that amount being all of the bonds of that company which have been sold, and that, after reserving the said $836,000 in the hands of the trustee, bonds be issued for an amount sufficient to pay the cost of constructing the cable road and properly equipping it, and the balance of the bonds, amounting in round numbers to $500,000, be not issued, except at such times and in such amounts as in the judgment of the board of directors of the new company shall be necessary to meet the payment of such additional equipment and extensions as the interest of the new company shall render desirable.

"It is believed that *every shareholder of the Los Angeles Cable Railway Company will see that it is for his interest to join with the majority in carrying out this arrangement, as by so doing he retains precisely the same relation to the property that he now does. He does not lose anything whatever, but is at the same time relieved of personal liability in the premises.* If any shareholder does not see it to be for his interest to join in this arrangement, the only method of paying the present floating indebtedness (which, upon the completion of the construction now in hand, on or about the 1st day of Sep-

tember, will reach the sum of $1,200,000,) will be to follow the method prescribed by the laws of California, namely, to assess the stock a sufficient amount to pay the indebtedness.    This assessment will be paid by the new corporation for all those persons who shall have exchanged their stock for stock in the Illinois corporation, and persons holding stock in the Los Angeles Cable Railway Company, and not exchanged for stock in the Illinois company, will be obliged to pay the assessment on their stock, or the same will be sold to pay said assessment, according to the statute in such cases made and provided.

"In pursuance of the recommendation made at the meeting as indicated above, a new corporation has been organized under the laws of the State of Illinois, entitled 'The Pacific Railway Company,' with the following named persons as directors for the first year, viz.: John J. Mitchell, Morton B. Hull, Alexander Geddes, James L. Houghteling and Charles B. Holmes.

"In this connection it may be of interest to add that the construction has been pushed with great energy, and the entire plant will be finished about the 1st of September, and it is fully believed that the expectations entertained of the property from the beginning (that the earnings, after paying all operating expenses and interest charges, will be sufficient to pay handsome dividends,) will be realized.    The first section of cable line, extending from Grand avenue and Seventh street to the center of the city, was opened on the 8th day of June last, and has operated continuously ever since without a single moment's delay, and without requiring any change to be made in machinery or other parts of the plant.    The second section, running from the center of the city to Boyle Heights, was opened to the public on the 3d day of the present month, and is operating with equal satisfaction. The balance of the road, including the extensions, is almost completed, and will be in the very best condition to take care of the vast volume of travel which it is believed

the road will secure, not only from the present residents of Los Angeles, but from the multitude of visitors who will make that city their winter home.

"If the plan outlined above meets your approval, you are requested to forward to the undersigned, at your earliest convenience, the certificates of stock held by you in the Los Angeles Cable Railway Company, endorsed in blank on the back, and upon receipt of the same there will be forwarded to you certificates of stock in the new corporation for the same number of shares as was surrendered by you in the old. If any point in the foregoing statement is not made sufficiently clear we shall be most happy to answer any inquiries you may be pleased to make.

> "Respectfully yours,
> C. B. HOLMES, *President, etc.*

"We concur in the foregoing:

> JOHN J. MITCHELL,
> JAMES L. HOUGHTELING,
> MORTON B. HULL,
> ALEXANDER GEDDES,
> CHARLES B. HOLMES,
> *Directors Pacific Railway Co.*"

The certificate of incorporation of the Pacific Railway Company was issued on the 22d day of August, 1889, and on the following day the persons whose names appeared as directors in the circular letter which was issued on the 15th of August, some eight days before the company was organized, were named as directors, and they selected as president of the said Pacific company said C. B. Holmes, who was at the same time president of said cable company, and by resolution directed their said president, as president, to enter into negotiations with the cable railway company, of which he was also president, for the transfer of the property, assets and franchises of the cable company to the Illinois corporation, in accordance with the scheme adopted at the meeting of the stockholders of the cable company at Chicago on the 5th day

of August, as hereinbefore set forth. Holmes took no
steps to exercise the authority to negotiate with the
cable company, thus conferred upon him, until the 7th
day of October, 1889, but in the meantime stockholders
of the cable company, or the greater number of them,
had responded to the circular letter hereinbefore set out,
and the greater part of the stock of the two companies
had been exchanged.

On the said 7th day of October, 1889, Holmes, as presi-
dent of the Illinois corporation, made a formal proposi-
tion, as authorized by the board of directors of the Illinois
corporation, for the transfer of the assets, property and
franchises of the cable company in exchange for stock in
the Illinois corporation, the obligations and indebtedness
of the cable company to be assumed by the said Illinois
corporation. The proposition was accepted by telegram
on the day it was received or on the following day. The
plan of exchanging the stock of the two companies was
carried into execution, and instruments were at once ex-
ecuted purporting to transfer the assets, property and
franchises of the cable company to the Pacific company,
but the control and management of the cable and horse
railways in Los Angeles were retained by the officials of
the California corporation, and the earnings paid into its
treasury, until some time in the following April.

The Pacific Railway Company became insolvent, and
George M. Bogue was appointed receiver on the 19th day
of January, 1891, and this proceeding was instituted by
the appellees, who are creditors of the Pacific Railway
Company, against the appellants, who are, as it is al-
leged, holders and owners of its stock, to enforce lia-
bility under the provisions of section 25 of chapter 32 of
the Revised Statutes, entitled "Corporations," to require
the said appellants to pay his and their *pro rata* share
of the debts due from the said Pacific Railway Company
to the extent the stock held by appellants was unpaid.

The judgment of the Appellate Court is as follows: "On this day come again the said parties, and the court having diligently examined and inspected as well the record and proceedings aforesaid as the matters and things therein assigned for error, and being now sufficiently advised of and concerning the premises, are of the opinion that in the record and proceedings aforesaid, and in the rendition of the decree aforesaid, there is manifest error. Therefore, it is considered by the court that for that error, and others, in the record and proceedings aforesaid, the decree of the circuit court of Cook county in this behalf rendered be reversed, annulled, set aside and wholly for nothing esteemed, and that this cause be remanded to the circuit court of Cook county, with directions to cause to be taken an account of the debts owing by the Pacific Railway Company, and to whom, and of the fair actual value of the property the company received for its stock at the time the said property was so received, and treat the stock as paid to the extent of such value, and when such account is taken, to enter a decree charging the stockholders, respectively, with their *pro rata* share of such debts of the company to the extent of the unpaid, if any, portion of their stock, respectively, after exhausting the assets of the company, as provided in section 25 of an act concerning corporations, approved April 18, 1872."

The proposition first advanced in behalf of the appellants in support of their contention the judgment of the Appellate Court should be reversed is, that the cable company contracted to sell, and sold, its assets of every description to the Pacific company, and the value of the property and assets so sold was fixed by the terms and conditions of the contract of sale entered into between the corporate bodies, and that, by force of the obligations of that contract, the Pacific company became bound to accept, and did accept, the net assets, property, franchises, etc., of the cable company in full payment of the

shares of its capital stock issued to and held by the appellants and other holders of shares of the stock of the cable company, and that the Pacific company, being so bound, the creditors of that company are also likewise bound by the contract between said corporate bodies, unless said creditors affirmatively establish the contract was fraudulent and void. The appellants insist proof of fraud is wanting, and that therefore the Appellate Court erred in directing that the actual value of the property received by the Pacific company should be ascertained by proof, and the stock issued by the Pacific company be deemed paid only to the extent of the actual value of said assets, property and effects of the cable company.

We entertain no doubt but that a corporation organized under the laws of Illinois may issue shares of its capital stock in payment for property of such character as it may lawfully possess and use, and may agree with the subscriber as to the value of such property, provided the agreement is made in good faith and in the exercise of judgment fairly and honestly directed. We do not, however, think the transaction which resulted in the transfer of the assets and effects of the cable company to the Pacific company had any effect to fix the price or value of such assets and effects, or that it constituted a contract of bargain and sale. The facts disclosed are, that the holders of shares of stock in the cable company, because of the embarrassed financial condition of the company and of the provisions of the statutes of the State of California making them personally liable for the obligations of the company in proportion as their shares were to the capital stock, were much concerned, and feared heavy financial loss would be entailed upon them. Moved by such apprehensions, a number of such owners of shares of stock, among them the president, vice-president and several members of the board of directors of the corporation, held a meeting in the city of Chicago on the 5th day of August, 1889, for the purpose of taking counsel to-

gether as to the situation, and of falling upon or devising, if possible, some plan or course of action by which they might free themselves from the obligations imposed upon them by the laws of the State of California. The statutes of Illinois do not cast upon holders of stock in corporations created in this State the obligation to pay the debts of the corporation, as do the laws of California, and it occurred to them the creation of a corporation in Illinois, and the transfer of the property and effects of the cable company to it by means of an exchange of the stock of the cable company for stock of the proposed Illinois company, would enable them to abandon the California corporation and relieve themselves of the statutory liability resting upon them as stockholders in a corporation organized under the laws of that State, while they would hold and retain such property and effects as stockholders in the Illinois company. They proceeded without delay to carry the scheme into execution, the first step being the issuance of the circular letter hereinbefore set out. On the 9th day of August certain of their number, including the president of the cable company and at least one member of its board of directors, applied to the Secretary of State of the State of Illinois for a license authorizing them, as commissioners, to receive subscriptions to the capital stock of the proposed new corporation, to be called the Pacific Railway Company, and immediately on receipt of such license such persons subscribed for the entire capital stock, which they fixed at the same sum and divided into the same number of shares as the capital stock of the California corporation. They paid nothing upon such subscriptions. The subscriptions were nominal, in fact, and only for the purpose of accomplishing a pretended compliance with the statute, in order to obtain a speedy organization of the corporation. Without waiting, however, for the actual organization of the Illinois corporation, the same persons who were acting as commissioners to secure subscriptions to its capital stock, one of whom

was the president of the cable company, another a director in that company and all shareholders therein, prepared and sent to each holder of stock in the California corporation the circular letter hereinbefore set out, the purpose of which was to hasten the surrender of the stock in the California company, in order that it might pass out of existence before some act of insolvency occurred which would fasten upon its stockholders liability to respond to its creditors as provided by the laws of that State. The Illinois corporation was organized August 23, 1889. The board of directors, on the day the organization was perfected, elected as president of the company one C. B. Holmes, who was also president of the California company, and authorized him to negotiate with the California company for the purchase of its assets and property, to be paid for in shares of the stock of the Illinois corporation, and the corporate functions of the Illinois company were at once employed in the discharge of the sole mission and purpose of its creation, namely, to secure the substitution of its stock for the stock of the cable company. The efforts in this direction were pursued with such vigor that the greater portion of the stock in the cable company was exchanged for stock in the Illinois company before the president of the Illinois company (he being at the same time president of the cable company) exercised the authority vested in him by the board of directors to submit a proposition to the cable company for the purchase, by way of exchange of shares of stock, of its assets and property, but the proposition for such exchange was finally made by letter on the 7th day of October, 1889, and was accepted by telegram on the same day or the next day after the letter reached the cable company. The entire stock of the Pacific company was issued and exchanged for the stock of the cable company, though the lines of street railway in Los Angeles remained in the control of the officers of the cable company and the earnings thereof were paid into the treasury of

the cable company for a period of more than five months after the transaction, which counsel for appellants contend was a contract of bargain and sale, had been fully executed.

It is perfectly clear this transaction is lacking in the material elements of a contract of purchase and sale. In the eye of equity the stockholders of the cable company were the owners of the property of the company, and the corporation but a mere fiction, created for the purpose of representing as a collective body the individual corporators. These corporators did not part, and did not intend to part, with any right of ownership by force of the transaction relied upon to constitute a sale. After the completion of the transaction these corporators or stockholders remained owners of the same interest and right in the same property which they possessed before its inception, and it is wholly immaterial, in an equitable point of view, that such right and interest therein are held under a different certificate of stock from that which formerly constituted the evidence of their ownership. The real purpose was to abandon the California corporation as the representative for them, collectively, and to create another artificial body—an Illinois corporation—to serve them in that capacity in the future. To paraphrase what was well said when a similar question was before the Court of Appeals of the State of New York, (*People* v. *Ballard*, 134 N. Y. 269,) it was a corporate burial in California for resurrection in Illinois. The resurrection, however, involved that measure of personal liability which the statute of Illinois attaches to the ownership of shares of the capital stock of a corporation created under the laws of Illinois. This liability is created by section 8 of chapter 32 of the Revised Statutes, which provides "each stockholder shall be liable for the debts of the corporation to the extent of the amount that may be unpaid upon the stock held by him." The Pacific company received the property and effects of the cable

company and assumed to pay the obligations of the latter company. An accounting as to the value of such property and effects and of its obligations to its creditors will determine the net value of the property and effects received by the Pacific company. In so far as the property and effects of the cable company exceeded the indebtedness of the company, the stock in the Pacific company should be deemed paid. Therefore the position of each appellant who held stock interest in the California corporation is, that instead thereof he is the holder of stock in the Illinois corporation paid up to the extent of the net value of his interest in the property and effects which were transferred from the California corporation to its successor, the Illinois corporation, and to that extent only, and therefore liable to the creditors of the latter corporation to the extent his stock is unpaid.

It is idle to contend the value of the property and effects so transferred was fixed and settled by the transaction which is denominated a sale. There was no sale, but simply an agreement entered into by and between holders of the stock of the cable company that they would transfer their stock interest to themselves, as stockholders in the Pacific company, and that the latter corporation should be their business representative. In pursuance of this agreement the parties thereto caused the Pacific Railway Company to be created. They were the only subscribers to its stock, and its officers and directors were of their body and chosen for the express purpose of acting in their behalf. From every equitable point of view the Pacific company was but the representative of the stockholders of the cable company, and the terms and conditions of the transfer but such as they agreed' upon among themselves, and of no further binding force. The value of the property owned by them as a collective body, the title whereof they transferred to' the Illinois corporation, was wholly unimportant and did not enter into their consideration, the only concern being

that the relative interests of the individual stockholders therein should be preserved. That was accomplished by giving the Illinois corporation the same capital stock as had the California company, and dividing it into shares of the same face value, and exchanging the shares of the two companies, share for share, without reference to the value of the property represented by such shares, giving to each shareholder the same number of shares in the new corporation that he had had in the old.

The rule of liability we have declared, it will be observed, is that which attaches to those who were owners of the stock in the cable company which they exchanged for shares in the Pacific company. The same rule will also apply to any purchaser or assignee of the shares in the Pacific company who acquired the shares with notice of the facts relative to the mode and manner or purpose of its issue. The rule as to an assignee who purchased in good faith and without notice is laid down in *Coleman* v. *Howe*, 154 Ill. 458, as follows (p. 471): "A purchaser or assignee of stock which has not been fully paid does not become liable to the corporate creditors for the unpaid balance, where the stock has been issued as fully paid, and he has acquired the same in good faith, and without notice that it has not been fully paid."

Where stock which has not been fully paid, but which was issued as paid up stock, is sold to a *bona fide* purchaser without notice that it is not fully paid, the remedy of the creditor is preserved against the assignor of such stock by the provisions of section 8, of chapter 32, of the Revised Statutes, entitled "Corporations," which provides no assignor of unpaid stock shall be released from his obligation to the creditors by reason of his assignment of the stock. Hence, if any of the owners of stock in the Pacific company who obtained the same in exchange for cable company stock held by them, assigned the same to an innocent purchaser or assignee, the obligation of such assignor, under the statute, to the creditors of the Pacific

company, remains in as full force as though he still owned the stock, and if his assignee received the stock with notice that it was, as we have held, in part unpaid, both assignor and assignee are, by the force and effect of the provisions of said section 8, liable to respond to creditors.    Nor is this liability in anywise affected by the fact the creditor knew, or did not know, when he extended credit to the corporation, that the stock was in part unpaid.    The liability of the stockholder is established by the statute for the purpose of securing to the creditor the benefit of the entire fund which, in the contemplation of the statute, will be created by subscriptions to the capital stock of the corporation.    The right of a creditor to avail himself of this liability of a stockholder arises out of the fact the stockholder has not, as the statute requires, paid the full amount of his subscription to the capital stock of the corporation, and the right is in nowise impaired by the fact that the creditor knew, or did not know, the stockholder was in default.

Counsel for the appellants cite adjudicated cases wherein it has been held that where subscriptions to the capital stock of a corporation was paid in property which was received by the corporation as in full payment of the subscription to its capital stock, such payment is, so far as the corporation is concerned, payment in full, and the corporation can enforce no further demand against the stockholder, and that a creditor of the corporation stands in no different position from the corporation, unless a fraud was committed on him by the arrangement between the corporation and the stockholder which operated to deprive him of some security upon which he had relied when he extended credit to the corporation; and also an expansion of the same doctrine, that if the creditor knew, when he gave credit to the corporation, the stock had been issued as full paid in payment for property purchased by the corporation, or had means of acquiring such knowledge, the creditor would stand in no

better position than the corporation, and could only en-
force liability against the stockholder in case the corpo-
ration could recover from such stockholder.   We think
the doctrine of these cases has no application as against
the express declaration of our statute that the creditor
shall be invested with a right to recover if the stock
has not been fully paid.   The legislative intent was, that
any amount unpaid upon subscription to the capital stock
of a corporation should constitute a fund, to which a
creditor of the corporation might resort to obtain sat-
isfaction of his demand against the corporation.   We
hold, therefore, that under our statute the right of a
creditor to enforce liability against one who has sub-
scribed for stock in a corporation and has not paid his
subscription in full, is not dependent, in any degree, up-
on the knowledge possessed by the creditor that such
subscription was or was not paid in full.   If unpaid to
the corporation it must be paid to the creditor.

The judgment of the Appellate Court that the decree
of the circuit court of Cook county be reversed and that
the cause be remanded to said circuit court is affirmed,
but its directions to said circuit court are modified, and
the said circuit court is directed to cause to be taken an
account of the debts owing by the Pacific Railway Com-
pany, and to whom, and of the fair actual value of the
property the company actually received for its stock at
the time the said property was so received, and of the in-
debtedness of the cable company which the Pacific com-
pany became liable to pay, and treat the stock as paid to
the extent such value of the property received exceeded
the sum of the indebtedness assumed, and when such ac-
count is taken, to enter a decree charging the appellants
who obtained stock in the Pacific Railway Company in
exchange for stock in the Los Angeles Cable Railway
Company, and those, if any, who obtained stock in the
Pacific Railway Company by assignment from former
owners, having at the time notice that such stock was

issued by the Pacific Railway Company in exchange for such stock in the Los Angeles Cable Railway Company, or notice that it was not in fact paid in full by the subscribers, respectively, with their *pro rata* share of such debts of the company to the extent of the unpaid, if any, portion of their stock, respectively, after exhausting the assets of the company, as provided in section 25 of the act concerning corporations, approved April 18, 1872. The costs in this court will be adjudged against the appellants.                                   *Judgment affirmed.*