STATE TRUST COMPANY, Appellant, v. M. P. TURNER.

**Stockholders:** PAYMENT FOR STOCK. Where property is received by a corporation at a speculative and excessive valuation in payment for shares of its stock, it is only a payment to the extent of the property received, and the owner of such stock is liable to the creditors for the difference between the true value of the property and the face value of the stock.

RIGHTS OF ASSIGNEE. Where a payee takes a note from a corporation, with knowledge that its stock was exchanged for property at an excessive valuation, his assignee, after maturity, who has secured judgment on the note against the corporation, cannot recover on such judgment against an owner of the stock, because he has not paid the full value of his stock, since such assignee has no greater rights against such owner than his assignor had.

*Appeal from Polk District Court.*—HON. C. P. HOLMES, Judge.

THURSDAY, MAY 24, 1900.

ACTION at law to recover of defendant the amount of a judgment held by plaintiff against a corporation known as

the Hess Electric Storage-Battery Company. The case was tried to the court on an agreed statement of facts, resulting in a judgment for defendant. Plaintiff appeals.—*Affirmed.*

*Bowen & Brockett* for appellant.

*Phillips, Ryan & Ryan* for appellee.

DEEMER, J.—The Hess Electric Storage-Battery Company is a corporation organized under the laws of this state in the year 1890. It was created "to perfect a storage-battery system patented by one H. K. Hess, and to adapt it to practical use for light and power; the buying and selling of the patent and any other necessary and proper article to be used herewith; to procure other letters patent; and to buy and sell electric light plants, patents, batteries, etc.; and to lease, purchase, or sell electric current for any legitimate purpose." The capital stock was fixed at one hundred thousand dollars, divided into one thousand shares of one hundred dollars each, of which not exceeding ninety thousand dollars might be issued and used as fully paid for the purchase of patents or property to be used in the business. The balance of the stock was to remain as treasury stock, and sold to such persons and on such terms as the board of directors should determine; none of it to be issued, however, until fully paid. The articles were signed by H. C. Porter, H. K. Hess, A. R. Case, defendant, and others. Defendant was vice-president and a director of the corporation. After the filing of the articles, Porter, Case, and Hess made a proposition to sell certain patents which they claimed to own and hold, to the corporation, for ninety thousand dollars of its capital stock, fully paid up, and an additional sum of five hundred dollars in cash as soon as the corporation was able to pay. The board of directors of the corporation accepted the proposition, and Porter, Case, and Hess made an assignment of their patents, and of such property as they had on hand for experimental and manufacturing purposes, to the

corporation, and received from it ninety thousand dollars of its fully-paid stock. The books of the corporation show that, the day before the aforesaid proposition was made, ten shares of stock, of the face value of one thousand dollars, were issued to defendant, Turner. This stock recited that it was fully paid. Turner paid nothing to the corporation for the stock, but the same was treated by all parties as a part of the ninety thousand dollars to be issued to Porter *et al.*, and was issued to him on their order. He paid Porter and his associates twenty cents on the dollar in cash for the stock, and has owned the same to this day. On the day the proposition was made, twenty shares of the stock were issued to Porter; but he never received them, and the books show that they were canceled and reissued to D. H. Gouring and T. S. Catcart. Ten of these shares issued to Gouring were canceled, and new certificates for the same were issued to defendant. The other ten of these twenty shares were also canceled and reissued to defendant. Neither Turner, Gouring, nor Porter paid anything to the corporation for this stock, but it was treated as a part of the ninety thousand dollars hitherto mentioned. Turner paid Gouring twenty cents on the dollar for the stock issued to him. The remainder of the ninety thousand dollars in stock was issued as follows: ten shares to R. R. Ballis, ten to F. B. Collins, ten to George C. Boggs, five to O. L. F. Browne, five to D. W. Chase, five to A. I. Lee, five to J. H. Woods, five to F. A. Fields, and five to W. H. Langan, all of whom had signed the original articles of incorporation; and the balance was issued to Porter *et al.*, or to other persons on their order. The stockholders have never held a meeting, but the board of directors held meetings until the latter part of the year 1894, since which time it has held no meetings. It was also agreed as follows: "(6) That the chemicals, material, and property mentioned in the said written proposition, including tools and instruments intended or adapted to the manufacture of batteries and motors, or used or intended for experiment,

were of the value of $500, and at the time of the purchase of said property by the said Hess Electric Storage-Battery Company, as hereinbefore stated, the said patented articles had not been put largely into practical use, but many experiments and tests had been made with reference to its practical utility, all of which were known to the said Hess Electrical Storage-Battery Company, and its tests and experiments had shown satisfactory results; and the incorporators believed at the time of said purchase of said patent and property that the same was of very great value, and hoped and believed said company would realize therefor and thereon largely more than the ninety thousand dollars paid therefor. (7) That the said incorporators and stockholders of said incorporation continued to experiment with and test said patented articles until late in the year 1894, receiving numerous offers for the purchase of territory and for the placing of the same in use upon cars and otherwise, many of which offers were rejected by said Hess Electric Storage-Battery Company because of the belief that said patents and the use of said patent articles were worth more than the offers made therefor, and for the use thereof; that during said period other inventions for the use and application of electricity as a motive power were discovered and invented, whereby and by reason whereof the Hess Electric Storage-Battery Company has not, so far, been able to realize revenues therefrom to any large extent,—that is to say, the said corporation has not been able to make any sales satisfactory to said company, and the said patents and property have never brought to the corporation any remuneration adequate to meet its entire expenditures." In September of the year 1893 the corporation borrowed of the Commercial Loan Association the sum of six hundred and seventy dollars, and executed its notes therefor, due one month after date. The loan association had knowledge of all the facts hitherto recited regarding the organization of the corporation, and of the manner in which it had issued and disposed of its stock, and was fully

cognizant of all the facts regarding the purchase and sale of the patents and property, and of the value thereof. After the maturity of the note, the loan association transferred the same to plaintiff. Plaintiff recovered judgment thereon against the corporation, and after an execution had been issued, and returned "No property found," it commenced this action. On these facts the case was tried to the court, resulting in a judgment for defendant, and from that judgment the appeal is taken.

Involved primarily is the so-called "trust-fund doctrine," as applied to stockholders' obligations to creditors. This is founded on the proposition that as the state undertakes to relieve the stockholder in a corporation of general liability for the debts of the concern, to the amount that he has invested in the enterprise, he ought, in good faith, to pay in money or its equivalent the face value of the stock received; and, if he fails to do this, he should be treated as holding the remainder in trust for the benefit of the creditors of the corporation. From this proposition two apparently conflicting and inconsistent rules have grown up, one of which may be called the "true-value rule," and the other the "good-faith rule." Courts adopting the good-faith rule are also divided on the proposition as to what is necessary to be shown to constitute good faith. Some of them hold that, in the absence of an affirmative showing of fraud *aliunde,* mere overvaluation of the property given in exchange for stock will not render the stockholder liable for the difference, while others hold that overvaluation itself, especially if gross, constitutes, or at least raises a strong presumption of, fraud. The development of the trust-fund doctrine may be gathered from a reading of the following: *Wood v. Dummer,* 3 Mason, 308, Fed. Cas. No. 17,944; *Sawyer v. Hoag,* 17 Wall. 610 (21 L. Ed. 731); *Handley v. Stutz,* 139 U. S. 427 (11 Sup. Ct. Rep. 530, 35 L. Ed. 227), and cases cited therein; *Hollins v. Iron Co.* 150 U. S. 371 (14 Sup. Ct. Rep. 127, 37 L. Ed. 1113); *Osgood v. King,* 42 Iowa,

478. Cases holding to the true-value doctrine are as follows: *Van Cleve v. Berkey,* 143 Mo. 109 (44 S. W. Rep. 743, 42 L. R. A. 593); *Joseph v. Davis,* Ala* (10 South. Rep. 830); *Gates v. Stone Co.,* 57 Ohio St. 60 (48 N. E. Rep. 285); *Haldeman v. Ainslie,* 82 Ky. 395; *Libby v. Tobey,* 82 Me. 397 (19 Atl. Rep. 904); *Elyton Land Co. v. Birmingham Warehouse & Elevator Co.,* 92 Ala. 407 (9 South. Rep. 129, 12 L. R. A. 307); *Clayton v. Knob Co.,* 109 N. C. 385 (14 S. E. Rep. 36); *Gogebic Inv. Co. v. Iron Chief Min. Co.,* 78 Wis. 427 (47 N. W. Rep. 726). Some of those holding to the first division of the good-faith rule are *Smith v. Prior,* 58 Minn. 247 (59 N. W. Rep. 1016); *Schenck v. Andrews,* 57 N. Y. 147; *Van Cott v. Van Brunt,* 82 N. Y.535; *Graves v. Brooks,* 117 Mich. 424 (75 N. W. Rep. 932); *Coit v. Amalgamating Co.,* 119 U. S. 343 (7 Sup. Ct. Rep. 231, 30 L. Ed. 420); *Kelley v. Fletcher,* 94 Tenn. 1 (28 S. W. Rep. 1099); *Rickerson Roller-Mill Co. v. Farrell Foundry & Machine Co.,* 43 U. S. App. 452 (23 C. C. A. 302, 75 Fed. Rep. 554); *Phelan v. Hazard,* 5 Dill. 45, Fed. Cas. No. 11,068; *New Haven Horse-Nail Co. v. Linden Springs Co.,* 142 Mass. 349 (7 N. E. Rep. 773). And of those holding to the second division are *Douglass v. Ireland,* 73 N. Y. 104; *Boynton v. Andrews,* 63 N. Y. 96; *Hastings Malting Co. v. Iron Range Brewing Co.,* 65 Minn. 28 (67 N. W. Rep. 652); *Kelly v. Mining Co.,* 21 Mont. 291 (53 Pac. Rep. 959, 42 L. R. A. 621); *Lloyd v. Preston,* 146 U. S. 630 (13 Sup. Ct. Rep. 131, 36 L. Ed. 1111); *Wallace v. Manufacturing Co.,* 70 Minn. 321 (73 N. W. Rep. 189). It will be noticed that there is some confusion in the New York and United States supreme court cases, and it is difficult to say just what rule prevails in Illinois. See *Sprague v. Bank,* 172 Ill. 149 (50 N. E. Rep. 19, 42 L. R. A. 606). But the supreme court of the United States has never departed from the prin-

Not officially reported.—Reporter.

ciples of *Sawyer v. Hoag,* and other like cases. See *Camden v. Stuart,* 144 U. S. 104 (12 Sup. Ct. Rep. 585, 36 L. Ed. 363. Nothing further need be said regarding the attitude of the various courts of the country on these propositions. Some of the cases cited may not clearly fall to the places assigned them, but on the whole, we think this as fair a classification of the authorities as can be made. In view of our previous holdings, this discussion may seem unnecessary; but, as counsel seem to think that the question is new to this court, we have attempted to state in brief some of the holdings in other jurisdictions.

We think our previous cases adopt the true-value rule,—perhaps not to its full extent; but such has been the drift of these cases. In *Osgood v. King,* 42 Iowa, 478, we said: "Every principle of honesty and justice demands that, as between the stockholder and the creditor, the stock shall be considered paid only to the extent of the fair value of the property conveyed, and that for the balance the stockholder shall be held individually liable." In *Jackson v. Traer,* 64 Iowa, 477, quoting from Taylor on Corporations, we said: "If the property secured is grossly unequal in value to the par value of the shares, the subscriber who secured the shares originally, or his subsequent transferee with notice of the circumstances, may be compelled to make up the difference in value." In *Chisholm v. Forny,* 65 Iowa, 333, Seevers, J., speaking for the court, said: "Persons dealing with the corporation had the right to assume that it owned valuable assets to the amount of its capital stock; that is to say, that, in consideration for the stock issued, the corporation had received money or property which would be available to pay an indebtedness incurred in its business. A patent is, as has been said, a property in a notion, and has no corporal, tangible substance, and cannot be levied on and sold under execution issuing from

state courts; and whether it can be sold on executions issuing from the federal courts is regarded as doubtful. Until its usefulness has been established, the value of a patent right is purely speculative." Judge Robinson, in *Wishard v. Hansen,* 99 Iowa, 307, uses this language: "Where the capital stock of a corporation is issued to one of its promoters and organizers for property which is taken at a gross overvaluation, the transaction is fraudulent against creditors of the corporation, if it be insolvent; and the stockholder who receives such stock with knowledge  *  *  * will be liable to creditors, on the stock he holds, for the difference between the par value  *  *.  * and the amount actually paid." In *Stout v. Hubbell,* 104 Iowa, 499, it is said. "It is alleged *  *  * that the land was given and received under an agreement that it was a full payment for the stock. This alone, would, be no defense; for this court has held, as to creditors of a corporation, that, when property is received by the corporation at an excessive valuation in payment for shares of its capital stock, it is only a payment to the extent of the value of the property received, and the owner of such stock is liable to creditors for the difference between the actual value of the property and the face value of the stock." In *Carbon Co. v. Mills,* 78 Iowa, 465, we again quoted with approval the rule announced by Mr. Taylor in his work on Corporations, and said that no plea of fraud was necessary. From this review it is apparent that we have, in effect, adopted the true-value rule, although saying in some cases that the reason for so doing was to prevent fraud. There is nothing in these decisions or in the statutes that inhibits the taking of property in exchange for stock, providing it is taken at its true value; and this value we do not think should in all instances, if in any, be measured by results. The parties have the right in good faith to agree on the value of the property taken, but this should not be a speculative or fictitious one. An honest mistake in judgment will not necessarily destroy the value agreed upon, but it must be such

a valuation as prudent and sensible business men would approve. Values based on visionary or speculative hopes, unwarranted by existing conditions or facts, and without reasonable evidence from present appearances, are not such as the law will tolerate, as against creditors. It is apparent that the patent and property sold the corporation by Porter *et al.*, had no such value as the parties placed upon it. The valuation was wholly speculative, visionary, and imaginary, as experience has shown. Indeed, we doubt if the parties thought it had any such value as they fixed upon it. They say they hoped and believed the company would realize therefor and thereon more than ninety thousand dollars, but no one had the temerity to say that he regarded the patent and property as of that value. The actual value received was but little over five hundred dollars.

But it is said that, as plaintiff's assignor had full knowledge and notice of all the facts, plaintiff cannot recover. This contention requires a little further examination of the rationale of the trust-fund doctrine. Consideration of the cases will show that it grew out of a desire on the part of courts to protect creditors who invested their funds on the faith that the capital stock was fully paid up, and represented the true assets of the corporation. Mr. Justice Miller, in *Sawyer v. Hoag, supra,* said: "We think it now well established that the capital stock of a corporation, especially its unpaid subscription, is a trust fund for the benefit of the general creditors of the corporation." He further said: "It is thought but just that when the interests of the people or of strangers dealing with this corporation are to be affected by any transaction between the stockholders who own the corporation, and the corporation itself, such transaction should be subject to rigid scrutiny, and if found to be infected with anything unfair towards such third person, calculated to injure him, or designed, intentionally and inequitably, to screen the stockholder from loss, at the expense of the general creditors, it should be disregarded or annulled so far

as it may inequitably affect him." In *Upton v. Tribilcock,* 91 U. S. 45, 23 L. Ed. 203, this rule is announced: "The capital stock of a moneyed corporation is a fund for the payment of its debts. It is a trust fund, of which the directors are the trustees. * * * The capital stock paid in, and promised to be paid in, is a fund which the trustees cannot squander or give away." Justice Woods, in *Scovill v. Thayer,* 105 U. S. 143 (26 L. Ed. 968), says: "The reason is that the stock subscribed is considered in equity as a trust fund for the payment of creditors. It is so held out to the public, who have no means of knowing the private contracts made between the corporation and its stockholders. The creditor, therefore, has the right to presume that the stock subscribed has been or will be paid up; and if it is not, a court of equity will, at his instance require it to be paid." In further explanation of the doctrine, Justice Brewer, speaking for the court in *Hollins v. Iron Co.,* 150 U. S. 371 (14 Sup. Ct. Rep. 127, 37 L. Ed. 1113), said: "Yet all that is meant by such expressions ["trust fund"] is the existence of an equitable right, which will be enforced whenever a court of equity, at the instance of a proper party, etc., has taken possession of its assets. It is never understood that there is a specific lien or a direct trust." Quoting from Pomeroy's Equity, he further says: "They are not in any true and complete sense trusts, and can only be called so by way of analogy or metaphor." He further likens a creditor's rights in such a case to the rights of a creditor of a partnership. Justice Field, in *Fogg v. Blair,* 133 U. S. 534 (10 Sup. Ct. Rep. 338, 33 L. Ed. 721), also announced a similar doctrine. Justice Woods, in *Scovil v. Thayer,* gives some of the reasons for the rule; and he says, in substance, that if a corporation sells its stock, as fully paid, for a discount, it cannot thereafter make calls for the purpose of increasing its business. "The shares were issued as full paid, on a fair understanding, and that bound the com-

pany. * * * But the doctrine of this court is that such a contract, though binding on the company, is a fraud, in law, on its creditors, which they could set aside; that when their rights intervene, and to satisfy their claims, the stockholders could be required to pay their stock in full." Following this doctrine to its logical conclusion, it was held in *Bank v. Alden,* 129 U. S. 372 (9 Sup. Ct. Rep. 332, 32 L. Ed. 725), that, where the creditor has full knowledge of. the transaction between the corporation and its stockholder at the time he extends credit, he cannot be heard to complain for the reason that no credit is given upon a representation of a different set of facts than those which actually existed. See, also, *Coit v. Amalgamating Co.,* 119 U. S. 343 (7 Sup. Ct. Rep. 231, 30 L. Ed. 420); *Walburn v. Chenault,* 43 Kan. Sup. 352 (23 Pac. Rep. 657); *Whitehill v. Jacobs,* 75 Wis. 474 (44 N. W. Rep. 630); *Young v. Iron Co.,* 65 Mich. 111 (31 N. W. Rep. 814); *Woolfolk v. January,* 131 Mo. Sup. 620 (33 S. W. Rep. 432); *Manufacturing Co. v. Wallace,* 16 Wash. 614 (48 Pac. Rep. 415); *Robinson v. Bidwell,* 22 Cal. 379; *First Nat. Bank of Deadwood v. Gustin Minerva Con. Min. Co.,* 42 Minn. 327 (44 N. W. Rep. 198, 6 L. R. A. 676). Indeed, we find no case to the contrary, unless it be *Sprague v. Bank,* 172 Ill. 149 (50 N. E. Rep. 19, 42 L. R. A. 606). That decision was based on a statute, however, which is somewhat different from ours, in that it made each stockholder liable for the debts of the corporation to the extent of the amount that may be unpaid on the stock held by him. Our statute says that nothing in the chapter contained, and nothing in the articles of incorporation, shall relieve the stockholders from individual liability, etc. (Code, section 1631); leaving the liability to be determined under the general law. *Light Co. v. Child,* 68 Conn. 522 (37 Atl. Rep. 391), relied on by appellant, is not in point. There the statute imposed a liability on the stockholder to the extent of twenty-five per cent. of the amount of stock held by

him. We have heretofore recognized these rules. While saying *argundo* that a sale of stock at a less rate than that fixed in the charter is a fraud upon the law and the stock-holders (*Oliphant v. Mining Co.*, 63 Iowa, 332, yet in *Goff v. Windmill Co.*, 62 Iowa, 691), we further said: "The public has the right to assume, when the stock of a company has been issued as full-paid stock, that it has been paid for in money, or in property at a fair value. * * * If it has not been paid, * * * while this might be ground for a proceeding in the interest of the public to wind up the company, it is not ground on which the plaintiff can predicate his right to relief; * * * and, besides, he not only knew upon what basis the stock had been subscribed and paid for, but he subscribed and paid for his stock on the same basis." This, it will be observed, was also *dictum*. But in *Callanan v. Windsor,* 78 Iowa, 193, we held, in effect, that the assignee of a creditor of a corporation could not recover unpaid subscriptions to capital stock where the creditor knew when he extended credit that the stock, although issued as fully paid, had not in fact been so paid. Referring to the statute ('Code 1873, section 1082), which is the same as section 1631 of the present Code, we said: "We are aware of the provisions of section 1082 of the Code. The primary object of those provisions was to protect creditors of the company. They should not be held to apply to a case of this kind, where, by virtue of a valid agreement, to which the original creditor was a party, nothing was due or collectible on the stock of the stockholder." In that case we approved the doctrine of *Scovill v. Thayer* and *Robinson v. Bidwell, supra.* In *Stout v. Hubbell,* supra, the same rule is recognized and applied; but, as plaintiff in that case had no notice, he was permitted to recover. See, also, *Clark v. Coal Co.*, 86 Iowa, 436. As the Commercial Loan Association had full knowledge of all the facts relating to the issuance and payment for the stock owned by the defendant, it could not recover. Does plaintiff, its trans-

feree after maturity, have any greater rights? We think not. Our statute (Code, section 3461) provides that "the assignment of a thing in action shall be without prejudice to any * * * defense * * * existing in favor of the defendant and against the assignor before notice of the assignment." But in *Richards v. Daily,* 34 Iowa, 427, we said the holder of a negotiable note transferred after maturity takes it subject to all equities arising out of the note itself, such as payment, etc., but not subject to an independent set-off, and that the section just quoted did not change the rule. Indeed, it is elementary doctrine that a transferee of overdue negotiable paper takes it liable to all equities to which it was subject in the hands of the payee. But those equities must attach to the paper itself, and not arise from any collateral transaction. *Young Men's Christian Ass'n Gymnasium Co. v. Rockford Nat. Bank,* 179 Ill. Sup. 599 (54 N. E. Rep. 297); *Gibson v. McIntyre,* 110 Iowa, 417. This rule has no application to the case at bar: The maker of the note (the corporation) is interposing no defense. Plaintiff had judgment on the note without defense on the part of the maker. Its present action is not on the note, but is an attempt to collect its judgment against a stockholder of the corporation. The law merchant has nothing to do with such a case. It is a mere right or chose in action incident to ownership of the note, acquired in virtue of a transfer thereof, and plaintiff has no other or greater rights with respect to defendant's liability than its assignor had at the time of the assignment. If defendant was in any sense a party to the note, then he might interpose any defense he held against plaintiff's assignor. But, if not a party, then his liability to plaintiff exists by reason of the assignment and transfer of the note. If a mere chose in action against defendant was transferred, then, under the statute, plaintiff has no greater rights than its assignor. In *Callanan v. Windsor, supra,* plaintiff was the assignee of the original creditor, and it was held that he had no greater rights than his assignor. That

case is determinative of several of the qustions presented by this record.

We have already said more, perhaps, than the case warrants; but as the questions are important, and the authorities are conflicting, we have attempted to lay down rules that may be followed in this class of actions, that are becoming more frequent in this age of corporations. Our conclusion is that the judgment of the trial court should be, and it is, AFFIRMED.