## WILHELMINE MEYER v. RUBY TRUST MINING & MILLING COMPANY et al., Appellants.

### Division One, December 21, 1905.

1. **CORPORATION: Defective Summons: Waiver.** A corporation, shown by the sheriff's return to have been summoned as a garnishee by service upon the president but not at the office of the company, which later appeared in court, and, without limiting or qualifying its appearance and without questioning the sufficiency of the service except to assert that the judgment was rendered without notice, moved to set aside the judgment and alleged that the attachment debtor was indebted to it, waived any defect in the service or return of service.

2. **———: Suing Stockholders to Pay Debts: Solvency.** The contention of stockholders, holding stock that was not full-paid, and sought to be charged with a debt adjudged against the company as garnishee, that the company was solvent at the time that judgment was obtained, as shown by the fact that it owned valuable property which was not covered by a mortgage, is answered by a showing that the same question was adjudicated in a suit by another creditor of the company wherein the same property was held to be covered by the mortgage and not subject to sequestration.

3. ———: ———: **Dying Pendente Lite: Contribution.** The fact that some of the stockholders, who held stock of an insolvent corporation issued as full-paid up and non-assessable, died during a suit by a judgment creditor of the company to compel an assessment upon them sufficient to pay his debt, and that the suit was not revived as to them, does not create a defect of parties, and cause the suit to abate as to the surviving defendants, either under the laws of Illinois, where the company was chartered, or under the law of Missouri, where it transacted its business. It is wholly immaterial whether all the stockholders or only a limited number or only one is sought to be held liable, for each surviving stockholder is liable to the extent of his unpaid subscription and no more. The question of the right of contribution does not enter into the case.

4. ———: ———: **When Stockholder is Liable.** A purchaser of full-paid non-assessable stock for less than its face value, at a time when the company's capitalization exceeded the value of its property, which facts are known to him, is liable for the debts of the company, when it becomes insolvent, for the difference between the amount for which the stock was sold by the company and its face value.

5. ———: ———: ———: **Trust Fund: Honesty of Incorporators.** Unpaid subscriptions of the capital stock of a corporation constitute a trust fund for the benefit of creditors. While the incorporators may turn over property instead of cash in payment of stock, that property must be fully equal to the value placed upon it, and its value is not determined by the opinions of those turning it over, even though they may have honestly believed it to be worth the amount certified.

6. ———: ———: ———: **Knowledge.** All persons who take stock reciting it is full-paid and non-assessable with knowledge that it was paid for in property, take it subject to the right of a creditor of the company to have the question of whether or not it was fully paid adjudicated in the courts. But persons who have no knowledge of such facts, but take it as fully paid and non-assessable, cannot, at the suit of a creditor of the company, be held liable for any unpaid subscription, or for the difference between the amount they paid and its par value.

7. ———: ———: ———: **Judgment Concocted in Fraud.** D. was the owner of stock and being indebted over $40,000 to plaintiff, absconded, and was sued by plaintiff in attachment, who summoned the defendant company, which owed D. a note for $3,500, as garnishee. Thereafter D.'s attorney turned over to plaintiff D.'s shares of stock in the company and D.'s note, and plaintiff obtained judgment by default against the company for the amount of the note. *Held,* that it cannot be contended

by the stockholders of the company when sued by plaintiff as a creditor of the insolvent company, that plaintiff's judgment against the company in the garnishment proceeding was, as to them, concocted in fraud upon the court because plaintiff did not disclose to the court the fact that she held D.'s stock and note.

8. ———: ———: ———: **Knowledge of and Participation in Fictitious Issue: Rights of Assignee.** A stockholder, who was a party to a transaction whereby property was turned over to a corporation at a fictitious value as payment in full of the stock issued as full-paid and non-assessable, whether the company was a Missouri or Illinois corporation, cannot be heard to say that the stock is not full-paid stock, even though he loaned money to the company, nor can he hold his fellow stockholders, as for unpaid subscriptions on their stock, to satisfy a judgment in his favor for money actually loaned to the company. Nor can his creditor, who by operation of law becomes his assignee, do so, for such assignee is in no better position than he is. [Distinguishing Sprague v. Bank, 172 Ill. l. c. 168.]

9. ———: ———: ———: ———: ———: **Illinois Corporation: Decision of That State.** Where the corporation, whose creditor seeks to hold liable its stockholders as for unpaid stock subscriptions, is an Illinois corporation, this court will follow the decisions of the courts of that State holding the stockholder liable even though the creditor participated in the fictitious issue of stock, notwithstanding this court has on numerous occasions refused to hold liable stockholders of a Missouri corporation in such case. But where the facts in judgment in the only Illinois case so holding were wholly different from those in this case, there is no rule of comity requiring this court to defer to that decision, and hence this court will follow its own settled ruling on such subjects.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood,* Judge.

Reversed.

*W. B. & Ford W. Thompson* for appellants.

(1) The court committed error in not holding that the judgment obtained againt the Ruby Trust Mining and Milling Company in the suit wherein the company was garnished by plaintiff for the alleged debt claimed

to be due from said company to plaintiff's judgment debtor, Dieckmann, was void. (a) Because the evidence showed conclusively that the judgment was void for want of jurisdiction over said Ruby Trust Mining and Milling Company, garnishee. (b) Because the evidence showed conclusively that the judgment was obtained by fraud and collusion and that said Dieckmann had transferred and delivered his claim to plaintiff herself prior to the entry of said judgment against said Ruby Trust Mining and Milling Company. Foster v. Lumber Co., 23 L. R. A. 491; Bentliff v. London & Colonial Finance Corporation, 44 Fed. 667; St. Louis W. M. Co. v. Consolidated B. W. Co., 32 Fed. 802; Latimer v. Railroad, 43 Mo. 105; Railroad v. Rogers, 52 W. Va. 450, 12 L. R. A. 178; Schmidlapp v. Ins. Co., 71 Ga. 246; 14 Am. and Eng. Ency. Law, 816; Bridge & Iron Works v. Breevoort, 73 Mich. 155; Moore v. Wayne Circuit Judge, 55 Mich. 84; McAlister v. Ins. Co., 28 Mo. 214; McNicholl v. Mercantile Rep. Agency, 74 Mo. 457; Fletcher v. Wear, 81 Mo. 524; Gates v. Tusten, 89 Mo. 13; Swallow v. Duncan, 18 Mo. App. 622; Bushel v. Ins. Co., 15 S. & R. 176; Dawson v. Campbell, 2 Miles 170; Wilson v. Seligman, 144 U. S. 41; Wilson v. Railroad, 108 Mo. 588; Smith v. McCutchen, 38 Mo. 415; Bissit v. Navigation Co., 15 Fed. 353; Warrington v. Ball, 90 Fed. 464; Bank v. Farnum, 176 U. S. 640; McBryan v. Elevator Co., 130 Mich. 111; Schroeder v. Bank, 133 U. S. 67; Slee v. Bloom, 20 Johns. 669; Saylor v. Banking Co., 38 Ore. 204; Mandeville v. Reynolds, 68 N. Y. 528; Conway v. Duncan, 28 Oh. St. 102; Wilson v. Kiesel, 9 Utah 397; Choat v. Boyd, 59 Kan. 682; Schertz v. Bank, 47 Ill. App. 124; Chestnut v. Pennell, 92 Ill. 55; Nichols v. Stevens, 123 Mo. 96; Moody v. Peyton, 135 Mo. 482; Hamilton v. McLean, 139 Mo. 678; Nelson v. Barnett, 123 Mo. 564; Covington v. Chamblin, 156 Mo. 574; 10 Cyclopedia of Law and Procedure, 733, 734; Young v. Farwell, 139 Ill. 326. (2) The court committed error

in entertaining jurisdiction of plaintiff's bill because: (a) The evidence showed that no judgment against the corporation had been recovered in the State of its creation or domicile. (b) No valid judgment had been recovered against said corporation in the State of Missouri. (c) No proper and valid service had been obtained upon the company in this present bill, and none could be had in the State of Missouri. (d) There was a want of necessary parties defendant. Parkhurst v. Railroad, 102 Ill. App. 507; Pfaff v. Gruen, 92 Mo. App. 560; Luecke v. Treadway, 45 Mo. 507; Boeppler v. Menown, 17 Mo. App. 447; Jerman v. Benton, 79 Mo. 148; Shickle v. Watts, 94 Mo. 410; Wheelock v. Kost, 77 Ill. 296; Patterson v. Lynde, 112 Ill. 196, 106 U. S. 520; Bank v. Ellis, 172 Mass. 39; Howarth, Receiver, v. Lombard, 175 Mass. 570; Bank v. Baker, 176 Mass. 294; Clark v. Knowles, 187 Mass. 35; Witman v. Bank, 176 U. S. 559; Bank v. Farnum, 176 U. S. 640; Perry v. Turner, 55 Mo. 418; Friend v. Powers, 93 Ala. 114; Brobston v. Downing, 95 Ga. 505; DeWolf v. Mallet, 25 Ky. 401; Hodley v. Russell, 40 N. H. 109; Mann v. Pantz, 3 N. Y. 415; Story v. Wheaton, 38 Bard. 616; Griffith v. Mangam, 42 N. Y. Supp. 369; Smith v. Railroad, 8 Ohio C. C. 583; Carpenter v. Bank, 14 Wis. 705; Coleman v. White, 14 Wis. 700; Coleman v. Howe, 154 Ill. 458; Tipton v. Harris, 1 Peck 414; Dell v. Mantell, 1 Abb. Pr. 130; Roger v. Weakley, 2 Part. 576; Angell v. Lawton, 14 Hun 70. (3) The court committed error in entertaining this bill and entering judgment thereon, because: (a) No judgment of the court of either the State of Illinois or Missouri has ever been recovered upon which an execution against the Ruby Trust Mining and Milling Company has issued and been returned *nulla bona* by the sheriff. (b) The evidence of both plaintiff and defendant shows that at the time of the entry of judgment in the garnishment against the Ruby Trust Mining & Milling

Company said company was possessed of assets in Colorado more than sufficient to satisfy a valid judgment against said company. Pfaff v. Gruen, 92 Mo. App. 560; Guerney v. Moore, 131 Mo. 650; Union Svgs. Assn. v. Seligman, 11 Mo. App. 142; Marks v. Hardy, 86 Mo. 232; Knight v. Frost, 14 Mo. App. 331; McClaren v. Franciscus, 43 Mo. 452; Coquard v. Prendergast, 35 Mo. App. 237; Henderson v. Turngren, 9 Utah 432. (4) The court committed error in holding that the capital stock of the Ruby Trust Mining and Milling Company was not fully paid in fact under the laws of Illinois. Coleman v. Howe, 154 Ill. 468; Reclining Car Seat Co. v. Rankin, 45 Ill. App. 226; Mallinckrodt Chemical Works v. Glass Co., 34 Ill. App. 413; Sand Co. v. American Refuse Crematory Assn., 205 Ill. 46; Peck v. Coal Co., 11 Ill. App. 88; Dean v. Baldwin, 99 Ill. App. 582. (5) The court committed error in not finding that plaintiff had no higher or greater right than Dieckmann, her assignor, and that said Dieckmann was estopped from denying that the capital stock of the company was fully paid and unassessable, because: (a) The evidence shows conclusively that Dieckmann gave credit to the company with full knowledge of the manner in which the stock had been issued for property and not for cash, and that it had been taken and received as full payment for the capital stock. (b) The evidence conclusively shows that Dieckmann participated in and agreed to the issuance of the capital stock in exchange for property as full payment therefor. Schweitzer v. Tracy, 76 Ill. 345; Link v. Gibson, 93 Ill. App. 433; Taylor v. Mississippi Mils, 47 Ark. 247; Knapp-Stout & Co. v. Stanley, Garnishee, 45 Mo. App. 264; Walburn v. Chenault, 43 Kan. 352; Higgins v. Lansingh, 154 Ill. 301; Thayer v. Union Tool Co., 70 Mass. 75; Potter v. Stevens Machine Co., 127 Mass. 592; Thompson v. Bemis Bag Co., 127 Mass. 595; Scovill v. Thayer, 105 U. S. 143; Coffin v. Ransdall, 110 Ind. 417; Trust Co. v. Turner, 111

Iowa 664; Whitehill v. Jacobs, 75 Wis. 474; Coit v. Gold Amalgamated Co., 119 U. S. 343; Callahan v. Windsor, 78 Iowa 193; Ten Eyck v. Railroad, 114 Mich. 494; Northern Trust Co. v. Columbia Straw Paper Co., 75 Fed. 936; Woolfork v. Jaunary, 131 Mo. 620; Berry v. Rood, 168 Mo. 316; New Haven H. N. Co. v. Linden Spring Co., 142 Mass. 352. (6) The court committed error in not holding that all who held stock with notice of the manner and way in which the capital of the corporation was paid in exchange of property for shares of stock, and who were stockholders at the date of the recovery of the judgment against the corporation, were liable, in the alleged absence of assets of any kind out of which an execution could be satisfied, or partly satisfied by the sheriff; this bill not being filed until September 16, 1892, while the alleged judgment was obtained March 3, 1890. McClaren v. Franciscus, 43 Mo. 452; Skrainka v. Allen, 76 Mo. 384; Bagley v. Tyler, 43 Mo. App. 195; Miller v. Ins. Co., 50 Mo. 55; Brown v. Trail, 89 Fed. 641; Nixon v. Breen, 11 Exch. 549; Van Cleve v. Berkley, 143 Mo. 120; Trendley v. Railroad, 84 Ill. App. 109; Parkhurst v. Railroad, 102 Ill. App. 507; Coleman v. Howe, 154 Ill. 458; Sprague v. Bank, 172 Ill. 149; Florshein v. Trust Co., 192 Ill. 382; Higgins v. Bank, 193 Ill. 394; Foote v. Bank, 194 Ill. 600; Sand Co. v. Crematory Co., 205 Ill. 42; Bank v. Alden, 129 U. S. 372; Thompson v. Paper Co., 127 Mass. 595.

*Rassieur, Schnurmacher & Rassieur* and *Schulenburg & Meyer* for respondent.

(1) Regardless of statutory law, the capital stock of an insolvent corporation constitutes a trust fund or asset to which creditors have a right to look for the payment of their demands; and any agreement or arrangement between the stockholders and the corporation that stock which has not been actually paid

for shall be treated as fully paid or non-assessable, is utterly void as to creditors. Banking Co. v. Wool Mfg. Co., 168 Mo. 645; Van Cleve v. Berkley, 143 Mo. 109; Shields v. Hobart, 172 Mo. 491; Berry v. Rood, 168 Mo. 316; Ramsey v. Mfg. Co., 116 Mo. 323; Foster v. Planing Mill Co., 92 Mo. 79; Ins. Co., v. Floyd, 74 Mo. 286; Upton v. Tribilcock, 91 U. S. 45; Scovill v. Thayer, 105 U. S. 154; Camden v. Stuart, 144 U. S. 113. And a creditor has the right to presume that the stock subscribed has been, or will be, fully paid, and if it is not, the courts will, at the instance of the creditor, compel its payment. Van Cleve v. Berkey, 143 Mo. 109; Scovill v. Thayer, 105 U. S. 154; Adler v. Brick Mfg. Co., 13 Wis. 57. (2) Such capital stock may be paid for in property as well as in money, but in such case the property must be the fair equivalent in value to the par value of the stock issued therefor; and it is the duty of the stockholders, and not of the creditor, to see that it is so paid. Therefore, in a controversy between creditors and stockholders, where the capital has been paid for in property, the true inquiry is, whether the property possessed a value equal, or at least substantially equal, to the par value of the stock. Whether the stockholders acted in good faith or in bad faith, whether they believed or did not believe, or whether they had reason to believe or had not reason to believe, that the property possessed an equivalent value to the par of the stock, are all immaterial questions under the rules of the law as now firmly established. If it develops that the property delivered for the stock did not substantially equal it in value, the stockholders must pay the difference. Such is their legal undertaking. Van Cleve v. Berkley, 143 Mo. 109; Berry v. Rood, 168 Mo. 331; Rumsey Mfg. Co. v. Kaime, 173 Mo. 559; Hill v. Coal & Mining Co., 124 Mo. 165; Shickle v. Watts, 94 Mo. 410; Sprague v. Bank, 172 Ill. 149; Malting Co. v. Brewing Co., 65 Minn. 28; Chisholm v. Forney, 65 Ia. 333; Scho-

ville v. Thayer, 105 U. S. 154; 23 Am. and Eng. Ency. Law (1 Ed.), 860. Even in those jurisdictions where fraud must be established, mere overvaluation, especially if gross, as here, raises a presumption of fraud. National Tube Works v. Gilfillan, 124 N. Y. 302; Douglas v. Ireland, 73 N. Y. 104; Boynton v. Hatch, 47 N. Y. 232; Coleman v. Howe, 154 Ill. 458. (3) The same doctrine of liability prevails in Illinois, the domicile of the Ruby Trust Mining and Milling Company. Sprague v. Bank, 172 Ill. 149; Thayer v. Mining Co., 40 Ill. App. 344; Bank v. Railroad, 66 Ill. App. 320. And the liability of the stockholders is there reinforced by the statute laws of the State. (4) The liability of the stockholders in this case depends upon the law as it prevails in Illinois. The remedy will be governed by the laws of Missouri. Leucke v. Tredway, 45 Mo. App. 507; Guerney v. Moore, 131 Mo. 650; Shickle v. Watts, 94 Mo. 410; McClure v. Iron Co., 90 Mo. App. 657; Beale on Foreign Corporations, sec. 442. No scheme, device or trick by which the incorporators attempt to void the liability imposed by law on stockholders, will be upheld. Issuing $7,998,400, worth of stock to Chandler as trustee, in consideration of an unpaid option on three mining claims, the entire amount to be paid under the option being only $125,000, and having Chandler immediately surrender all the stock to three other of the incorporators as trustees, who thereupon issue to themselves and their associates "'Trustees' Certificates" subject to "voluntary" assessments, instead of the usual certificates of stock, is too transparent a scheme to deceive the eyes of justice. Coleman v. Howe, 154 Ill. 458; Bates v. Tel. Co., 134 Ill. 546; Ins. Co. v. Mfg. Co., 97 Ill. 537; Howe v. Ill. Agrl. Works, 46 Ill. App. 85; Alling v. Wentzell, 46 Ill. App. 562; Kern v. Building Assn., 40 Ill. App. 356; Tribilcock v. Upton, 91 U. S. 45; Sawyer v. Hoag, 17 Wall. 610. (5) The judgment recovered by plaintiff against the Ruby Trust Mining and Milling Company

as garnishee of Dieckmann, establishes plaintiff's status as a creditor and is conclusive against defendant stockholders, both as to the validity and amount of plaintiff's claim, and such judgment can only be impeached for fraud or want of jurisdiction. Guerney v. Moore, 131 Mo. 667; Hawkins v. Glenn, 131 U. S. 319; Schertz v. Bank, 47 Ill. App. 421; Corse v. Sanford, 14 Ia. 235; Stephens v. Fox, 83 N. Y. 313; Powell v. Railroad, 38 F. R. 187; Baines v. Babcock, 95 Cal. 581; Thompson on Liability of Stockholders, secs. 329, 337. (6) Knowledge on the part of Dieckmann when he loaned the company the money which resulted in the judgment against it as garnishee, that the stock was not full paid, is immaterial, and cannot affect plaintiff's rights under the statutes of Illinois creating the liability of the stockholders. Sprague v. Bank, 172 Ill. 149; Allen v. Bank, 172 Ill. 270; Bank v. Railroad, 66 Ill. App. 320; Higgins v. Bank, 61 N. E. 1025; National Tube Works v. Gilfillan, 124 N. Y. 302. (7) The evidence showed, and the referee found, that the Ruby Trust Mining and Milling Company was insolvent and possessed of no assets of any kind, either in Missouri or elsewhere. Execution and *nulla bona* return were, therefore, not necessary to maintain this proceeding, for the law does not require the doing of a vain and useless thing. Guerney v. Moore, 131 Mo. 666; State Sav. Assn. v. Kellogg, 52 Mo. 583; Patterson v. Lynde, 112 Ill. 196; 23 Am. and Eng. Ency. Law, 886.

MARSHALL, J.—This is a proceeding in equity, instituted on the 16th day of September, 1892, against the defendant corporation, a corporation organized under the laws of the State of Illinois, and one hundred and forty individuals alleged to be shareholders in the defendant corporation. The purpose of the suit is to charge the individual defendants with an alleged unpaid portion of their several subscriptions of the

shares of stock owned by them, to satisfy a judgment obtained by the plaintiff against the company in the circuit court of St. Louis, on the 28th day of May, 1889, for $3,691.33, with interest thereon, and which amount it was adjudged the company owed one Henry Dieckmann, against whom the plaintiff had theretofore, on the 18th of April, 1889, obtained a judgment for $40,038.44.

The pleadings are very voluminous, the petition covering some seven printed pages, and the answers of the defendants covering sixty printed pages. The case was referred to a referee, who heard the same and recommended a judgment in favor of the plaintiff against certain of the defendants, certifying the amount which should be charged against each separately. The report of the referee was confirmed by the circuit court, and after proper steps the defendants appealed.

### THE ISSUES.

The petition, after stating the corporate capacity of the defendant company, and the fact that she had obtained a judgment against the company as garnishee of Dieckmann, and that such judgment was final, in full force and unsatisfied, and pleading the Illinois statutes, under which the defendant company is organized, and the provisions of the laws of that State relating to the liability of stockholders for unpaid subscriptions of stock, alleges that on the 13th of July, 1888, the defendant company was organized under the laws of Illinois, with an alleged capital of 800,000 shares of the par value of $10 each; that fifteen persons, defendants herein, each subscribed for ten shares of the capital stock; two of them subscribed for five shares thereof, and the remaining 799,840 shares were subscribed for by one Charles F. Chandler, and that the seventeen persons aforesaid had never paid more than twenty cents a share for their shares, nor had said Chandler

paid more than twenty cents a share for the stock held by him; that thereafter the original subscribers, together with other persons, purchased from said Chandler large quantities of said 799,840 shares, specifying how many shares of stock were owned by each of the one hundred and forty individual defendants.

The prayer of the petition is that the court ascertain the liability of the different defendants and adjudge against each his proportionate share of the amount necessary to pay the plaintiff's judgment against the company, as an unpaid subscription of his stock.

The company and certain of the defendants filed answers setting up various defenses, which may be summarized as follows:

First, that the judgment in favor of the plaintiff against the defendant corporation, as garnishee, is void;

Second, that at the date of said judgment the corporation was solvent and the plaintiff could have made her debt out of the corporation by levying upon property alleged to have been then owned by it in the State of Colorado;

Third, that there is a defect of parties hereto, in that, some of those who were originally brought in have since died and this action has not been revived against their representatives;

Fourth, that the stock of the individual defendants is full paid and non-assessable stock;

Fifth, that even if the judgment against the corporation, as garnishee, is valid, it cannot be legally enforced by this plaintiff against these defendants, or any of them, as stockholders, because Dieckmann, the original debtor to the plaintiff, could not have enforced it against his fellow stockholders, and therefore the plaintiff cannot do it; and further because the judgment against the corporation was obtained by fraud of the plaintiff in the very concoction thereof.

The facts in judgment necessary to be considered in this cause, are substantially undisputed, and may be briefly stated to be as follows:

In 1886 some gentlemen in St. Louis conceived the idea of engaging in mining. They selected one of their number, F. W. Buschman, to go to Colorado and find a mine. Buschman did so and first acquired a mine, which after being operated for a time at a loss, was abandoned. Buschman examined other mining property near Ouray, Colorado, with the result that he acquired an option for the purchase of three mines, The Ada, The Ana and the Ruby-Trust, of which the latter only had been at all developed, and which had been previously sold to other persons and forfeited by them to the original sellers. The option secured by Buschman entitled him to purchase the mine for $125,000, of which $30,000 was to be paid and was paid, in 1888, and the balance due to be paid in three installments, one for $30,000 on July 1, 1889, one for $30,000 on December 1, 1889, and the last for $35,000 on July 1, 1890. The contract provided that upon a failure to pay any one of the installments, the property should be forfeited to the sellers, with all the improvements put thereon. Prior to taking the option, Buschman examined the mine and had it examined by a mining expert at Ouray. The report of the expert showed the mine to be of great value, and contained information to the effect that $100,000 worth of ore had been previously taken from the mine. Buschman and his associates put up the money necessary for the examination of the mine, and were to share in the enterprise in proportion to their contributions. Some of Buschman's associates also visited and inspected the mine; many assays of the ore were made and all of the reports were favorable. The parties believed at that time that the mine was worth millions of dollars. In 1888 the parties determined to organize a corporation under the laws of Illinois. They accordingly did so, fixing the

capital stock at $8,000,000, divided into 800,000 shares of the par value of $10 each. Fifteen of the incorporators subscribed for ten shares of stock each and paid therefor the par value thereof. Two of them subscribed for five shares each and likewise paid the par value thereof in cash. The balance of the 799,840 shares were subscribed for by said Chandler. Chandler paid nothing in cash therefor. But for the purpose of having those shares appear as fully paid and non-assessable shares, the incorporators caused Buschman to transfer the option he had obtained on the Colorado mines to Chandler, and Chandler transferred that option to the company, and thereupon the 799,840 shares were considered by the incorporators as thus having been fully paid.

Thereafter, the original incorporators and other persons purchased portions of the 799,840 shares. The original incorporators were regarded as the "insiders," and those who came in afterwards by purchasing the stock that had been subscribed for by Chandler or by purchasing from such purchasers from Chandler, were regarded as the "outsiders." The company organized by electing Theo. Sessinghaus president, Fredrick Hattersley secretary, and C. J. Hennebrink treasurer. The business office of the company in St. Louis was kept at the private office of the secretary of the company, and the meetings of the company and the business of the company were transacted at that place. The stockbook was kept there, as was also a blotter, showing the amount of money received and expended. In August, 1888, the parties determined to pool the entire 800,000 shares of stock, and accordingly transferred them to a committee of three of their number. The pooling arrangements provided that the parties should increase their total contributions to six and one-fourth cents per share, and that the stock should be divided between the associates in proportion to their holdings, giving each one share for every six and

one fourth cents contributed by him.    The pooling agreement also limited the right of the owners to dispose of their shares, and provided, further, that if money was needed to carry on the mine an assessment should be made on the stock pooled.    Afterwards it was agreed that 80,000 shares in pool should be set apart as treasury stock and sold to raise money to carry on the venture, the same to be sold as full-paid and non-assessable stock.    Some of the stock owned by some of the defendants was of this 80,000 shares so set apart and sold.    Afterwards the parties agreed that 10,000 shares of the pool stock should be sold by the trustees at one dollar per share, but it is not clear that any of the defendants got any of such 10,000 shares. After the stock had been pooled it was distributed among the shareholders, giving to each one share of stock for every six and one-fourth cents contributed by him, and it appears that about $45,000 was thus received from the shareholders.    Of the 80,000 shares of treasury stock, and of the 10,000 shares ordered to be sold by the trustees, it appears that 35,862 shares were sold, and $11,954 realized therefrom.    This not being sufficient to carry on the business of the company, three assessments were made on the pool stock, from which $23,000 was realized.    The company also borrowed $3,500 from Dieckmann and gave him a note therefor.    In January, 1889, another assessment of four and one-half cents per share was levied on the pool stock, and $2,279.62½ was assessed against the shares thus held by Dieckmann.    Thereafter the members of the pool voted to sell large blocks of the pool stock so as to let purchasers in on the same footing with the original members, which seems to have been about fifteen or fifteen and one-half cents per share. The stock so sold was sold and represented to be full paid and non-assessable stock, and certain of the defendants herein purchased the same on that understanding, among them F. H. Luddington, who acquired

70,000 shares at about fifteen cents a share. Ludding-ton required that $10,000 of the purchase price of his shares should be held as a special trust for the pur-chase of a ten-stamp mill at the mine. Before purchas-ing, Luddington caused further examinations to be made of the mine, which resulted in it appearing that the mine was a very valuable one. Thereafter a com-mittee composed of Luddington and two others went to Colorado, examined the mines, and made a full and favorable report to the company, and recommended that a further assessment of five cents per share should be levied on the stock to raise the $30,000 necessary to be paid on the first of July, 1889. Nothing was done with that report, and in June, 1889, Luddington employed experts in St. Louis and sent them to examine the mines and report on the same, which they did and re-commended the abandonment of the mine, and advised against the payment of the $30,000 falling due July 1, 1889. In pursuance thereto there was a meeting held and the company voted to abandon the enterprise, surrender the property and cease to do business, which was accordingly done. The owners declared a forfei-ture and took possession of the property with all the improvements thereon, together with the ten-stamp mill, which had been purchased and stored unpacked near the property. The owners thereafter gave an op-tion on the mine to the other persons at $100,000; they operated it for awhile and then abandoned it. At the date of the forfeiture the company owed about $2,000 at Ouray, as it also owed the salary of the secretary and certain amounts advanced by Luddington. The creditors at Ouray attempted to secure payment of the debts due them by sequestration of the ten-stamp mill, but failed in so doing, the owners of the mine succeed-ing in holding it as part of the improvements which be-came theirs upon the forfeiture of the option.

Henry A. Dieckmann was one of the active promo-

ters of the enterprise, and was a son-in-law of the plaintiff. On the 6th of February, 1889, he hurriedly left the State of Missouri and went to Canada. On the 7th of February, 1889, the plaintiff instituted a suit by attachment against him to recover some $40,000 which it was alleged she had placed in his hands for safe-keeping, and which he had failed to account for. Before leaving the State Dieckmann placed in the hands of his attorney a package of papers containing a lot of trustees' certificates for shares of stock in the defendant company, which were held in pool as aforesaid, endorsed in blank, and directed him to deliver the same to the plaintiff, saying she had been hit hardest of all his creditors. The attorney delivered the package to the plaintiff about the 10th of February, 1889. Some weeks thereafter the attorney delivered to the plaintiff the note for $3,500 which had been executed by the defendant company to Dieckmann for moneys advanced by Dieckmann, and which was also endorsed in blank. The package containing the trustees' certificates was delivered to the plaintiff after she had instituted the attachment suit against Dieckmann, and the note for $3,500 was delivered to the plaintiff after the defendant company had been summoned as a garnishee of Dieckmann, which garnishment was served on the 11th of February, 1889.

The referee found that of the 75,790 shares of stock in the name of Dieckmann at the date of the attachment, 15,790 thus standing in his name belonged to other persons and that number of shares were released from the attachment, leaving 60,000 shares standing in Dieckmann's name; but the referee further found that the assessment of four and one-half cents per share, amounting to $2,279.62½, which was assessed against Dieckmann, represented 50,700 shares as the proper amount Dieckmann owned, and accordingly the referee treated that as the correct holding of Dieckmann at the date of the attachment.

The referee found, and the evidence sustained the finding, that the laws of Illinois provided that every assignment or transfer of stock, on which there remains any portion unpaid, shall be recorded in the office of the recorder of deeds in the county within which the principal office is located, and each shareholder shall be liable for the debts of the corporation to the extent of the amount that may be unpaid upon the stock held by him, and that the assignor of the stock shall not be released from such indebtedness by reason of the transfer, but shall remain jointly and severally liable with the assignee therefor until the stock is fully paid, and that when an action is brought to recover an indebtedness against the corporation, it shall be competent to proceed against any one or more stockholders at the same time to the extent of the balance of unpaid subscription whether called in or not, and that the assignee and assignor shall both be liable therefor.

The referee further found that the purchasers of the treasury stock, who purchased the same on the representation that it was fully paid and non-assessable, were not liable under the Illinois statute as stockholders holding unpaid shares, under the decisions of that State in Coleman v. Howe, 154 Ill. 458, and Sprague v. Nat. Bank, 172 Ill. 149.

The referee further found that of the original members of the pool five had died pending this suit, and that of the defendants herein, who purchased treasury stock, three had died during this suit, and therefore recommended that the action be dismissed as to all such.

The referee further found that the plaintiff recovered a judgment on the $3,500 note on March 3, 1890, against the defendant company as garnishee of Dieckmann for $3,691.93 with interest, and that said judgment remained in full force and unpaid, and that neither the company nor the other defendants in this

case have any offset to this judgment; and further found that no execution had ever been issued on the judgment, but that at the date of the judgment the defendant company had ceased to do business and had practically dissolved and owned no property in Missouri or Illinois out of which said judgment might have been made, and therefore the issue of an execution would have been an idle ceremony, and was unnecessary to entitle the plaintiff to institute and maintain this suit.

The referee further found that Dieckmann was one of the original associates in the venture, an incorporator and a director in the company, a member of the pool and one of the trustees, but that inasmuch as the claim upon which the plaintiff bases this action was for money loaned by Dieckmann to the company, his connection with the company did not estop him or the plaintiff from the benefit of the remedies afforded by the statutes of Illinois, as construed by the courts of that State, to collect the claim against his fellow stockholders, citing Sprague v. Nat. Bank, 172 Ill. 149.

The referee further found that in asserting such rights Dieckmann, or the claimant under Dieckmann, must bear his proportion of the burdens and was only entitled to collect the residue, over and beyond his proper proportions, from his fellow stockholders, under the decisions of this court in Guerney v. Moore, 131 Mo. 650, and Johnson v. Geneva Co., 122 Mo. 1. c. 104. The referee found that Henry Dickmann owned 50,700 shares in the pool at the date of the institution of this suit, and that the following named defendants were members of the pooling contract and owned shares in the pool as stated in the answer, as follows:

Fred Hattersley,.... .... .. .... .. 47,252
Charles J. Hennebrink,.. .. .. .. .. 27,419
John C. Fisher,.. .. .... .... .... .. 27,419
James S. McClellan,.. .. .... .. .. 28,158
William A. Nicholson, .... .... .... 14,210

| | |
|---|---|
| Wm. H. Horner,.... .. .. .... .... | 15,000 |
| Louis Helm,.. .... .... .... | 7,255 |
| Charles Hazel, .... ... .... .. .... | 7,237 |
| Fred W. Buschman,.... .... ... .... | 95,723 |
| William Paschedig,.. .... .... .... .... | 24,419 |
| Thomas W. Crutch, .... .... .... | 21,866 |
| David I. Buschnell,.... .... : ... .... | 4,000 |
| Clinton E. Udell,.... ....: .... .... | 4,000 |

But the referee further found that the last two named persons had paid at par for ten shares each and hence that should be deducted from their liability. He further found that said thirteen defendants included all of the members of the pool, defendants in this case, except those as to whom the suit has abated by death without revivor.

The referee further found that the shares of the defendant members of the pool, including the shares of Dieckmann, were not full paid shares, but that the sum of $9.70 per share still remains due thereon. The referee accordingly concluded that the number of shares which should contribute to the plaintiff's judgment, interest and costs, including the costs of this proceeding, is 374,548, of which 50,700 shares belonged to Dieckmann, and therefore the plaintiff was only entitled to charge the defendants with $\frac{323848}{374548}$ ths thereof, and according to the proportionate holdings of the thirteen defendants above specified.

The defendants filed nineteen separate exceptions to the findings of the referee. The circuit court overruled the exceptions and confirmed the report of the referee, and distributed the liability of the defendants to the plaintiff in the proportion of their holdings of stock as aforesaid, except that Wm. Paschedig had died and his executrix was brought in and the judgment was against her. The defendants then filed a motion for new trial and the court overruled the same.

In addition to the foregoing it is only necessary to add that the service of the garnishment upon the defend-

ant company on the 11th of February, 1889, was made
in the city of St. Louis by the sheriff of that city, by de-
livering a written declaration to Theo. Sessinghaus, the
president of the company, that he attached in the hands
of the company all debts, etc., due by the company to
Dieckmann, and by summoning the company in writing
as garnishee, delivering a summons of garnishment di-
rected to the company, to said Sessinghaus. This re-
turn does not show that the service aforesaid was had
upon the president of the company at the office of the
company in St. Louis. The garnishee failed to answer
the interrogatories at the return term and a judgment
by default was entered against it on the 28th of May,
1889. Thereafter, on the 31st of May, 1889, the de-
fendant company appeared and filed a motion to set
aside the judgment, assigning as reasons therefor that
said judgment was rendered without notice; that the
garnishee had an offset against Dieckmann's claim;
that there was due \$2,279.62½ to the garnished cor-
poration assessed against the shares of stock of said
Dieckmann; that the promissory note of the company
to Dieckmann on which the judgment was based had
been altered; that the plaintiff had agreed to notify the
officers of the corporation garnisheed before proceed-
ing to judgment in the case. In support of this motion
the garnishee filed affidavits of Theo. Sessinghaus, its
president, and Fred Hattersley, its secretary, and the
plaintiff filed the affidavits of her attorney, Leo Ras-
sieur, and of her agent, John T. Meyer. The motion
was considered by the court and on October 22, 1889,
an order was made that on payment of all costs accrued
in the case since May 22, 1889, to that date, within five
days thereafter, the motion to set aside the judgment
would be sustained, and five days given to the garnishee
to file an answer to the interrogatories. Otherwise the
motion would be overruled. The garnishee failed to
comply with the order and the motion to set aside the
judgment was overruled on the 3rd of March, 1890.

This feature of the case was again presented to the referee and testimony pro and con introduced bearing upon the allegations of the motion. The referee held that inasmuch as the court had given the defendant corporation an opportunity to defend and the company had failed to do so, he regarded the judgment as regular and valid against the corporation.

It will be observed that the referee and the court deducted from the amounts due Dieckmann and the plaintiff on account of the $3,500 note, a sum equal to $\frac{50700}{374548}$ ths thereof, that being the proportion of stock Dieckmann held to the total amount of stock held liable for the payment of the judgment, and thereby made Dieckmann and the plaintiff contribute that proportion to the payment of the $3,500 note.

From the judgment aforesaid the defendants held liable appealed.

I.

The first contention of the defendants is that the judgment in favor of the plaintiff against the defendant corporation, as garnishee, is void.

The point of this contention is that the summons or notice served by the sheriff of St. Louis on the garnishee, although served on the president of the company, fails to show that it was served at the office of the company in St. Louis, and hence the judgment rendered against the company is void, and therefore cannot be used as the basis of a suit to charge the stockholders of the company for unpaid subscription on their stock. The fact is that the return of the sheriff is defective in the respects claimed, and if that was all that was shown by this record, the contention would have been sustained, but that is not all that the record discloses on this subject. On the contrary it appears from the record that the judgment based upon such return was rendered on the 28th of May, 1889, and that on the 31st of May, 1889, the defendant company appeared in court, and without

questioning the sufficiency of the service of process or limiting or qualifying its appearance, moved to set aside the judgment, assigning as reasons therefor that the judgment was rendered without notice; that the company had an offset against Dieckmann's claim against it, represented by the note for $3,500, in that Dieckmann owed the company $2,279.62½ as an assessment against his shares of stock; that the note to Dieckmann had been altered and that the plaintiff had agreed to notify the officers of the company before proceeding to judgment in the case, and supported this motion with affidavits. The plaintiff filed counter-affidavits. Thereupon on the 22nd of October, 1889, the court ordered that the motion to set aside the judgment be sustained and five days given the garnishee to file an answer to the interrogatories, upon the payment by the garnishee of the costs accruing after the date of the judgment by default, and in the event the defendant failed so to do the motion should be overruled. The defendants failed to comply with the order and refused to take advantage thereof, and on the 3rd of March, 1890, the motion to set aside the judgment was ordered overruled.

The action of the defendant company in so appearing was a waiver of the defect in the service or return of service complained of [State ex rel. Lemon v. Board, 108 Mo. 235; State ex rel. v. Springer, 134 Mo. l. c. 227; State ex rel. v. Oliver, 163 Mo. l. c. 690.]

## II.

The second contention of the defendants is that at the date of the judgment against the garnishee, the corporation was solvent and the plaintiff could have made her debt out of the corporation by levying upon property alleged to have been then owned by it in the State of Colorado.

The basis of this contention consists in the fact that upon the coming in of the report of the experts sent to

examine the property in June, 1889, showing that the mine was valueless and recommending that the venture be abandoned, and advising against paying the $30,000 installment falling due on the 1st of July, 1889, upon which the shareholders acted and resolved to abandon the property, surrender the option and cease business, there was in Colorado, a ten-stamp mill stored, unpacked, near the mine, and that the plaintiff herein could have made her debt by a sequestration thereof.

This contention, however, is untenable, because the evidence discloses that the company owed $2,000 debts at Ouray, and that those unsecured creditors attempted to seize the mill to satisfy their claim, but that the owners of the mine successfully contended that the mill belonged to them under the terms of the option as being a part of the improvements the defendant company had put on the mine, and which became the property of the owners upon the option being forfeited. This was the status of the company on March 3, 1890, when plaintiff obtained judgment against the company. There was no other property in Colorado out of which the plaintiff's debts could have been made, and there never was any property in the State of either Illinois, where the company was organized, or in the State of Missouri, where all the stockholders and officers of the company resided, where all its meetings wereheld and all its business transacted.

There is, therefore, no merit in this contention.

### III.

The third contention of the defendants is that there is a defect in the parties hereto, in that, some of those who were originally brought in have since died and this action has not been revived against their representatives. Five of the original stockholders who were members of the pool, died pending this suit, and three of those who purchased treasury stock or stock from

the original purchasers, all of which purported to be full-paid and non-assessable, and as to which the purchasers had no notice to the contrary, also died *pendente lite,* and the suit was not revived as to any such. As to the purchasers of such treasury stock or stock from the original purchasers, the law of Illinois, under which this company was organized, is that they are not liable for the unpaid portion of the stock. [Coleman v. Howe, 154 Ill. 458; Sprague v. Nat. Bank, 172 Ill. 149.]

The same rule obtains in this State. [Berry v. Rood, 168 Mo. l. c. 332.]

As to the original subscribers, members of the pool, who died *pendente lite,* the referee properly held that the suit abated as to them. The Illinois statutes expressly provide that the assignor of stock on which there remains an unpaid subscription, as well as the assignee, shall be jointly and severally liable for the unpaid portion thereof. The liability being joint and several, and each stockholder being liable only to the extent of his unpaid subscription, it is wholly immaterial whether all of the stockholders, who have not paid their stock in full, or only a limited number of them, or only one of them, is sought to be held liable by a creditor. The fact that one who has been thus called on to respond has a remedy against the other stockholders for contribution, is no defense to an action by the creditor against him. As has been well said, "If a creditor were to be stayed until all such parties could be made to contribute their proportionate share of the liability, he might never get his money." [March v. Burroughs, I Woods l. c. 468; Hatch v. Dana, 101 U. S. 205; Herron v. Vance, 17 Ind. 595; Taylor on Private Corporations, sec. 705.] For the same reason it is immaterial that some of the original defendants have died *pendente lite* and the suit has not been revived against them, for the suit might have been instituted originally without joining these parties as defendants.

The identical question here involved has been decided adversely to the defendants' contention in Illinois. [Palmer v. Wood, 48 Ill. App. 630.]

## IV.

The next contention of the defendants is that the stock is full-paid and non-assessable stock.

The fact is that the promoters of the scheme secured an option on three mines near Ouray, Colorado, only one of which had been worked; for $125,000, to be paid in installments of $30,000 in 1888, which was paid, $30,000 on the 1st of July, 1889, $30,000 on the 1st of December, 1889, and $35,000 on the 1st of July, 1890. Before the second installment, due July 1, 1889, fell due, the parties became satisfied that the mine was worthless and surrendered their option and ceased business. The original option was taken by Buschman and was afterwards transferred to Chandler, and was turned over by Chandler to the defendant company and constitutes the sole consideration for the 799,840 shares, amounting to $7,998,400, which were issued to Chandler. The only cash that was paid for stock was by the seventeen subscribers, fifteen of whom subscribed for ten shares each and two for five shares each, and those who thus paid cash for stock are not held liable in this case, but their stock has been treated as full-paid. Some of them thereafter acquired portions of the Chandler stock, and those who did so with knowledge of the transaction are the only ones held liable in this case. The company was capitalized for $8,000,000. Thus it appears that with only an option on an undeveloped, uncertain mine, for which the promoters agreed to pay $125,000, but paid only to $30,000, a company was organized with a capital stock of $8,000,000, and $7,998,400 of stock was attempted to be paid up by the transfer to the company of the option aforesaid.

The mere statement of these facts is a sufficient demonstration of the utter fallacy of the contention.

Whatever doubt may have existed, and whatever room for contention there may have been on the subject as to the right of incorporators to turn over property, at a valuation put upon it by them, to the company, in payment of stock issued by the company, prior to the Constitution of 1875, and immediately thereafter, all such questions have been fully and finally set at rest by the clear, exhaustive and unanswerable opinion of BRACE, J., in Van Cleve v. Berkey, 143 Mo. 109. In that case the decisions in other States were elaborately reviewed, and the decisions of this State, beginning with Chouteau v. Dean, 7 Mo. App. 210, and running down to Woolfolk v. January, 131 Mo. 620, were fully set out and considered, and the conclusion drawn as follows:

"Upon a review of all the cases decided by the appellate courts of this State since the adoption of the Constitution of 1875, the ruling in all of which will be found to be in harmony, it is impossible to escape the conviction that in this State, whatever may be the case in some other States, the American Trust Doctrine, as suggested by Mr. Justice Harlan, has indeed been 'reinforced' by its Constitution and statutes; and that the proposition that the stock of a corporation must be paid for 'in meal or in malt,' in money or in money's value, is not a mere figure of speech, but has the significance of its terms. It may be paid for in property, but in such case the property must be the fair equivalent in value to the par value of the stock issued therefor; that it is the duty of the stockholders to see that it possesses such value; that when a corporation is sent forth into the commercial world, accredited by them as possessed of a capital in money, or its equivalent in property, equal to the par value of its capital stock, every person dealing with it, unless otherwise advised, has a right to extend credit to it on the faith of the fact that its capital stock has been so paid, and that the money, or its equivalent in property, will be forthcoming to respond to his legitimate demands. In short, that it is the duty

of the stockholder, and not of the creditor, to see that it is so paid; hence, the inquiry in a case between the creditor and a stockholder when property has been put in for the capital stock of a corporation, is not whether the stockholder believed, or had reason to believe, that the property was equal in value to the par value of the capital stock, but whether, in point of fact, it was such equivalent.''

This case has since been uniformly followed and approved by this court. [Hequembourg v. Edwards, 155 Mo. l. c. 520; Steam Stone Cutter Co. v. Scott, 157 Mo. l. c. 525; Berry v. Rood, 168 Mo. l. c. 330; Chrisman-Sawyer Co. v. Independence Mfg. Co., 168 Mo. l. c. 643; Shields v. Hobart, 172 Mo. l. c. 510; Rumsey Mfg. Co. v. Kaime, 173 Mo. l. c. 560.]

The rule in this State, therefore, is that unpaid subscriptions on capital stock of a corporation, constitute a trust fund for the benefit of creditors, and that whilst incorporators may turn over property instead of cash in payment of stock, that property must be fully equal to the value placed upon it, and its value is determined by the fact and not by the opinions of the persons turning it over, even though they may have honestly believed it to be worth the amount certified; and that all persons who take stock thus paid for with knowledge of the manner in which it was paid, take it subject to the right of a creditor thereof to have the question of whether it has been fully paid or not adjudicated by the court; but that where such stock is acquired by persons who have no knowledge of such facts, but who take it as fully paid and non-assessable stock, they cannot be held liable for any unpaid subscription nor for the difference between the amount they paid for the stock and the par value thereof. [Berry v. Rood, 168 Mo. l. c. 332; Trust Co. v McMillan, 188 Mo. 547.]

Upon the facts in judgment it is apparent in this case that the utmost that could be claimed for the 799,-840 shares of capital stock, which was subscribed for

and issued to Chandler, and by him transferred to other persons with knowledge of the facts aforesaid, is that it was paid only to the extent of the $30,000, paid for the first installment of the mine in 1888, and the assessment made for the stock after it was put into the pool, and that at least eighty-five per cent of it was unpaid stock at the date of the institution of this suit and of the judgment against the defendant company. The referee and the circuit court, therefore, properly held that as to all the defendants who owned any portion of that stock, they were chargeable.

## V.

The next contention of the defendants is that even if the judgment against the corporation, as garnishee, is valid, it cannot be legally enforced by this plaintiff against these defendants or any of them as stockholders, because Dieckmann, the original debtor to the plaintiff, could not have enforced it against his fellow stockholders, and therefore the plaintiff cannot do it; and further, because the judgment against the corporation was obtained by fraud of the plaintiff in the very concoction thereof.

The contention that the judgment against the corporation was obtained by fraud practiced by plaintiff on the court in the very concoction of the judgment rests solely upon the fact that after the attachment suit was instituted against Dieckmann, and after Dieckmann had left for Canada, his attorney turned over to the plaintiff the shares of stock in the defendant company owned by him, and after the service of the garnishment on the defendant company, Dieckmann's attorney turned over to the plaintiff the $3,500 note, and upon this basis it is contended that the plaintiff perpetrated fraud upon the court in procuring the judgment by not disclosing to the court the fact that she held the Dieckmann stock and the note for $3,500.

It does not appear that the plaintiff undertook to

claim any rights, as assignee of Dieckmann, either to the stock or the note. Having them in her possession did not deprive her of the right to prosecute to judgment her suit then pending against Dieckmann, and against the defendant company as garnishee of Dieckmann. Whatever rights the plaintiff has arise solely out of the judgment against the company as garnishee of Dieckmann. The plaintiff, therefore, is assignee of Dieckmann's rights by operation of law and not by virtue of the act of Dieckmann. Her attitude towards the defendant stockholders, however, is the same in every aspect of the case. The law conferred upon her only the rights that Dieckmann had to collect the debt of $3,500 against the company, and she had no better right than Dieckmann would have if he was the plaintiff, to hold the other stockholders for unpaid subscription of their stock in order to pay the $3,500 note. The claim that the judgment was procured by fraud, must, therefore, be resolved against the defendants.

The other contention of the defendants, to-wit, that as Dieckmann was a party to the original formation of the company and to the pooling contract, and that as he agreed that such stock should be issued as full paid stock in exchange for the option on the mine, he could not be heard, even as a creditor of the company for money actually loaned to it, to say, against those who stood in the same position with reference to the stock that he did, that the stock was not full paid stock; and, therefore, the plaintiff, as the assignee of Dieckmann by operation of law, stands in no better position than Dieckmann would if he was the plaintiff in this suit, presents a much more difficult question.

The law is well settled in this State that as to innocent creditors without notice as to the manner in which stock has or has not been paid up, the stock is or is not paid as the fact may appear, and such creditors can go behind the recitals on the face of the stock and show whether the stock was full paid stock, but that one who,

like Dieckmann, was a party to the transaction whereby property was turned over to the company as payment in full for the stock issued, cannot be heard to say that the stock is not full-paid stock, even though he has loaned money to the company, and cannot hold his fellow stockholders as for unpaid subscriptions on their stock, to satisfy a judgment in his favor for money actually loaned to the corporation. The reason of this rule is that such a person has not given credit to the company upon the faith of the unpaid subscriptions being an asset of the company. This doctrine is the settled law in this State. [Woolfolk v. January, 131 Mo. 620; Berry v. Rood, 168 Mo. l. c. 333.] The case last cited is in all essential legal principles identical with the case at bar, except that the corporation in that case was organized under the laws of this State, whereas the corporation in this case was organized under the laws of the State of Illinois. The contention of the plaintiff, however, is that this is an Illinois corporation and that the liability of stockholders is fixed by the law of that State, and that the *lex loci contractu*, and not the *lex fori* must be applied to the solution of this case. It is claimed by the plaintiff that the courts of last resort in Illinois have construed the statutes of that State, with respect to the liability of stockholders under circumstances such as are disclosed in this case, to mean that such liability ''is not dependent, in any degree, upon the knowledge possessed by the creditor that such subscription was or was not paid in full. If unpaid to the corporation, it must be paid to the creditor.'' [Sprague v. Bank, 172 Ill. l. c. 168-9. It is true that the broad language quoted was used by the Supreme Court of Illinois in the case cited, but the question here presented was not present in that case. That was a case where a corporation was organized under the laws of the State of California, which make the stockholders liable for a pro rata share of the debts contracted by the corporation during the time they were stockholders. Desiring

to rid themselves of this liability, the stockholders of the California corporation organized a new corporation, with a like amount of capital, under the laws of Illinois, which laws did not impose a like liability upon the stockholders. The California corporation then transferred its assets to the Illinois corporation, and in exchange therefor, the Illinois corporation issued shares of stock to the stockholders of the California corporation, the stockholders being the same in both. The Illinois corporation became insolvent and its creditors caused it to be placed in the hands of a receiver, and thereafter proceeded, in the case cited, by a bill in chancery, against the stockholders of the Illinois corporation, to hold them liable as for unpaid subscriptions on their stock, and showed that it was a scheme whereby the property of the California corporation had been attempted to be turned over to the corporation as payment in full for the stock of the Illinois corporation and that the property so turned over was not worth the amount of the stock, and asked that the difference be charged as unpaid stock subscription. There is nothing in the facts reported in that case which in any manner tends to show that the creditor or creditors thus seeking to hold the stockholders liable for unpaid subscription, were anything other than what is denominated under our decision as innocent creditors, who had given credit to the corporation on the faith of the unpaid stock subscription. None of the creditors in that case stood in the attitude of *particeps criminis* with the original promoters of the scheme. None of them occupied the position that Dieckmann and the plaintiff, as assignee of Dieckmann by operation of law, stand in this case. Therefore, whilst the language employed in the Sprague case—that while the right of the creditor to hold stockholders liable for unpaid subscriptions "is not dependent, in any degree, upon the knowledge possessed by the creditors that such subscription was or

was not paid in full''—is perhaps broad enough to cover this case, nevertheless, as the facts in judgment here are so unlike the facts in judgment in that case, and as the rule of law is settled in this State, that one who participates in a scheme whereby property is turned over to a corporation and full paid stock issued in payment therefor, is estoppel from suing his fellow stockholders for unpaid subscription on their stock, even though he has actually loaned money to the corporation, there is no comity or rule of law that requires this court to enforce the liability here attempted contrary to the rule so established in this State in such cases, when the statutes of the State where the contract was made do not cover such a case, and where the decisions of the courts of last resort of that State, construing such statutes, were not based upon facts at all similar to the facts involved in this case and upon which the rules established in this State are based.

If the facts in judgment in the Sprague case were like the facts in judgment here, this court might feel bound to enforce the interpretation placed upon the Illinois statutes by the court of last resort of that State, but the decision in the Sprague case imposes no such obligation on this court; and as such a result as is here sought is directly contrary to the rules that obtain in this State, this court will adhere to the rule heretofore announced by it in cases like this, until a similar case has been brought before the Supreme Court of Illinois, and that court has otherwise declared the law in that State upon similar facts. Upon the facts in judgment in the Sprague case, this court, under the rules announced in this State, would reach the same result that the Supreme Court of Illinois reached in the Sprague case. But as the facts in this case are so essentially different from the facts in judgment in the Sprague case, this court must read the decision of the Supreme Court of Illinois in that case in the light of the facts in judgment, rather than in the light of the general terms employed

by the court of last resort in that State as to the liability of stockholders. The general language used in the Sprague case, and herein quoted, may bear the interpretation that an innocent creditor without notice is entitled to recover against a stockholder as for unpaid subscriptions on his stock, even though at the time he extended credit to the company, he knew or did not know, the true status of the stock. In other words, if the stock was in any part unpaid, the creditor was entitled to recover the unpaid part thereof from the stockholder whether, at the time he extended credit, he was or was not aware that there was any such unpaid stock subscription. This view is borne out by other language used by the Supreme Court of Illinois in the Sprague case, where, after referring to the statute and the liability thereby created of the stockholder whether assignor or assignee, for unpaid subscription, the court said: "Nor is this liability in any wise affected by the fact the creditor knew, or did not know, when he extended credit to the corporation, that the stock was in part unpaid." In other words, this portion of the opinion imparts the idea that the liability of a stockholder for unpaid subscription does not depend upon whether the creditor at the time he extended credit to the company, knew or did not know, that there was any unpaid stock subscription available to him to satisfy his claim against the company.

That construction of the Illinois statute is exactly the same as the construction this court has placed upon the statutes of this State in similar cases, and that was as far as it was necessary for the Illinois court to go in deciding the facts in judgment in the Sprague case, and it will not be assumed, but must be construed, that the general language thereafter employed in the course of the opinion was not intended by that court as applicable to any other facts than those in judgment before it. As the facts in judgment here are not like those in judgment before the Supreme Court of Illinois at that

time, it follows that the decision in the Sprague case does not announce any rule in conflict with the rule announced by this court in Woolfolk v. January, and Berry v. Rood, supra.

The facts in judgment here bring this case clearly within the rule announced in this State in the two cases last cited. Dieckmann was one of the original promoters of the enterprise and of the defendant company, and agreed with the defendants, who are held herein, to the scheme, whereby the option on the mine was turned over to the company, and whereby the company issued the 799,840 shares of stock as payment therefor, and as full paid and non-assessable stock; and although the value was purely fictitious, and although Dieckmann actually loaned $3,500 to the company, nevertheless Dieckmann, in so loaning the money, did not do so upon the faith that he could recover the debt from his fellow stockholders on the ground that they had not fully paid their stock, nor could he do this by even crediting his debt with his proportion of the unpaid subscription on his stock. In other words, Dieckmann does not stand in the light of an innocent creditor, who trusted the company without notice as to the manner and circumstances in and under which the stock was issued as full paid stock, but he stands in the same boat as the other parties to the scheme, and as to him the stock must be treated as they agreed it would be treated, to-wit, as full paid stock. The plaintiff is the assignee by operation of law of Dieckmann and is in no better position than Dieckmann would be if he was the plaintiff in this action. [Trust Co. v. McMillan, 188 Mo. 547.]

It follows that the judgment of the circuit court must be reversed.

All concur.